ROGERS, J., delivered the opinion of the court, in which CLAY, J., joined. DONALD, J. (pp. 784-88), delivered a separate opinion concurring in part and concurring in the judgment.
OPINION
ROGERS, Circuit Judge.
When criminals use modern technological devices to carry out criminal acts and to reduce the possibility of detection, they can hardly complain when the police take advantage of the inherent characteristics of those very devices to catch them. This is not a case in which the government secretly placed a tracking device in someone’s car. The drug runners in this case used pay-as-you-go (and thus presumably more difficult to trace) cell phones to communicate during the cross-country shipment of drugs. Unfortunately for the drug runners, the phones were trackable in a way they may not have suspected. The Constitution, however, does not protect their erroneous expectations regarding the undetectability of their modern tools.
The government used data emanating from Melvin Skinner’s pay-as-you-go cell phone to determine its real-time location. This information was used to establish Skinner’s location as he transported drugs along public thoroughfares between Arizona and Tennessee. As a result of tracking the cell phone, DEA agents located Skinner and his son at a rest stop near Abilene, Texas, with a motorhome filled with over 1,100 pounds of marijuana. The district court denied Skinner’s motion to suppress all evidence obtained as a result *775 of the search of his vehicle, and Skinner was later convicted of two counts related to drug trafficking and one count of conspiracy to commit money laundering. The convictions must be upheld as there was no Fourth Amendment violation, and Skinner’s other arguments on appeal lack merit. In short, Skinner did not have a reasonable expectation of privacy in the data emanating from his cell phone that showed its location.
I.
Melvin Skinner was convicted by a jury on two counts related to drug trafficking and one count of conspiracy to commit money laundering in connection with his role as a courier in a large-scale drug-trafficking operation led by James Michael West.
The events leading up to Skinner’s arrest and conviction began in January 2006, when Christopher S. Shearer, a participant in West’s marijuana-trafficking conspiracy, was stopped in Flagstaff, Arizona with $362,000. Police stopped Shearer on his way to deliver money to West’s marijuana supplier, Philip Apodaca, who lived in Tucson, Arizona.
Drug Enforcement Administration (“DEA”) authorities learned from Shearer how West operated his drug conspiracy. Between 2001 and 2006, Apodaca would send marijuana that he obtained from Mexico to West in Tennessee via couriers. Apodaca purchased pay-as-you-go cell phones that he programmed with contact information and then gave to the couriers to maintain communication. When buying the phones, Apodaca provided false names and addresses for the phone subscriber information. After some time, West and his affiliates would discard their pay-as-you-go phones and get new ones with different telephone numbers and fictitious names. Apodaca was unaware that these phones were equipped with GPS technology-
In May and June 2006, authorities obtained orders authorizing the interception of wire communications from two phones that were not pay-as-you-go, but rather phones subscribed in West’s name. Through these calls between West and Shearer, agents learned that West used as a courier an over-the-road truck driver referred to as “Big Foot” (later identified as the defendant in this case, Melvin Skinner). From Shearer and the phone calls, agents determined that, on many occasions beginning in 2001, Big Foot delivered money to Apodaca in Arizona and then returned to Tennessee with hundreds of pounds of marijuana for West. Big Foot’s courier activities temporarily ceased between 2002-2004, but thereafter he resumed transporting drugs and money for West. In late 2005, West advanced Big Foot money to purchase a pickup truck for transporting drugs.
In June 2006, authorities determined that West was using one secret phone to communicate with Apodaca and a second secret phone to communicate with Big Foot. Authorities thought that Big Foot was using a phone with the number (520) 869-6447 (“6447 phone”).
Based on calls intercepted in late June and early July 2006, authorities learned that Big Foot had recently delivered between $150,000 and $300,000 to Apodaca to pay off existing drug debt and purchase additional drugs. In later calls between West and Apodaca, the agents also determined that Big Foot would meet Apodaca in Tucson, Arizona on July 11, 2006, to pick up approximately 900 pounds of marijuana. Big Foot would be driving a “nice [RV] with a diesel engine,” while Big Foot’s son would be driving an F-250 pickup truck, both with Southern license *776 plates. Big Foot would then leave for West’s home in Mooresburg, Tennessee, on or about Thursday, July 13, 2006. Believing that Big Foot was carrying the 6447 phone, authorities obtained an order from a federal magistrate judge on July 12, 2006, authorizing the phone company to release subscriber information, cell site information, GPS real-time location, and “ping” data for the 6447 phone in order to learn Big Foot’s location while he was en route to deliver the drugs.
That same day, agents “pinged” the 6447 phone and discovered that it was currently located in Candler, North Carolina, the location of West’s primary residence. Based upon intercepted calls as well as the 6447 phone’s records, agents determined that West was using the 6447 phone to communicate with Big Foot on a phone with a(520) 869-6820 number (“6820 phone”). Authorities then obtained a second order from the magistrate judge authorizing release of the same information for the 6820 phone, which revealed that the phone was located near Flagstaff, Arizona.
By continuously “pinging” the 6820 phone, authorities learned that Big Foot left Tucson, Arizona on Friday, July 14, 2006, and was traveling on Interstate 40 across Texas. At no point did agents follow the vehicle or conduct any type of visual surveillance. At around 2:00 a.m. on Sunday, July 16, 2006, the GPS indicated that the 6820 phone had stopped somewhere near Abilene, Texas. Authorities coordinated with agents in the Lubbock, Texas office of the DEA, who were quickly dispatched to a truck stop. At the truck stop, agents discovered a motorhome and a truck with Georgia license plates. An officer approached the motorhome, knocked on the door, and introduced himself to the man, later identified as Skinner, who answered the door. After Skinner denied the officer’s request to search the vehicle, a K-9 officer and his dog who were at the scene conducted a perimeter dog sniff around the motorhome that alerted officers to the presence of narcotics. The officers then entered the motorhome, where they discovered sixty-one bales of marijuana, over 1,100 pounds, as well as two cellular phones and two semi-automatic handguns. Skinner and his son, Samuel, were placed under arrest.
Skinner was charged with conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and aiding and abetting the attempt to distribute in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2.
Prior to trial, Skinner sought to suppress the search of the motorhome, alleging that the agents’ use of GPS location information emitted from his cell phone was a warrantless search that violated the Fourth Amendment. After an evidentiary hearing, the magistrate judge determined that, “[b]ased on the thrust of Fourth Amendment precedent and the facts of this case,” Skinner lacked standing to assert a Fourth Amendment protected interest because the cell phone was not subscribed to him and was used as part of a criminal scheme. The magistrate judge further opined that because the cell phone was utilized on public thoroughfares and was “bought by a drug supplier and provided to ... Skinner as part and parcel of his drug trafficking enterprise,” Skinner did not have a legitimate expectation of privacy in the phone or in the motorhome that was driven on public roads. In addition, the magistrate judge determined that, “even if the search was found unconstitu *777 tional, the good faith exception would apply.” The district court fully adopted the magistrate judge’s Report and Recommendation, and denied Skinner’s motion to suppress.
Skinner’s case proceeded to a ten-day trial, and the jury found Skinner guilty on all counts. Skinner moved for a judgment of acquittal, or in the alternative a new trial, and the district court denied the motion.
At sentencing, the district court heard testimony regarding the drug conspiracy and Skinner’s role in it. In calculating Skinner’s base offense level, the presentence report had included only the amounts of marijuana personally attributed to Skinner. Skinner argued, however, that due to his minimal role in the conspiracy he should receive a mitigating role adjustment under U.S.S.G. § 3B1.2. The district court determined that no mitigating role reduction was warranted because Skinner “facilitated the transportation of vast amounts of marijuana and money back and forth across the country” and “[t]he conspiracy would not have been successful without the participation of the drivers.” Therefore, because Skinner “facilitated and allowed this conspiracy to progress,” the district court found that he was “more than just a minor or minimum player.”
Skinner was sentenced to 235 months’ imprisonment as to each of Counts One, Two, and Three, with the terms to run concurrently. This term of imprisonment was at the low end of the advisory guideline range of 235-239 months.
Skinner now appeals, arguing that the use of the GPS location information emitted from his cell phone was a warrantless search that violated the Fourth Amendment, that there was insufficient evidence to find him guilty of conspiracy to commit money laundering, and that as a minor participant in the drug conspiracy he was entitled to a mitigating role reduction.
II.
A. No Fourth Amendment Violation
There is no Fourth Amendment violation because Skinner did not have a reasonable expectation of privacy in the data given off by his voluntarily procured pay-as-you-go cell phone. If a tool used to transport contraband gives off a signal that can be tracked for location, certainly the police can track the signal. The law cannot be that a criminal is entitled to rely on the expected untrackability of his tools.[1] Otherwise, dogs could not be used to track a fugitive if the fugitive did not know that the dog hounds had his scent. A getaway car could not be identified and followed based on the license plate number if the driver reasonably thought he had gotten away unseen. The recent nature of cell phone location technology does not change this. If it did, then technology would help criminals but not the police. It follows that Skinner had no expectation of privacy in the context of this case, just as the driver of a getaway car has no expectation of privacy in the particular combination of colors of the car’s paint.
This conclusion is directly, supported by United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). In Knotts, the police, with the consent of a chemical company, placed a beeper in a five-gallon drum of chloroform in order to track the movements of a defendant and *778 discover the location of a clandestine drug laboratory. Using visual surveillance, as well as the signal emitted from the beeper when police lost visual contact, law enforcement officials traced the car to a secluded cabin, where the defendant and others had been manufacturing illicit drugs. The Supreme Court held that this monitoring did not violate the Constitution because “[t]he governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways.... A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Id. at 281, 103 S.Ct. 1081. The Court noted that, in Knott’s case, “[a] police car following [a defendant] at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin.... [T]here is no indication that the beeper was used in any way to reveal information ... that would not have been visible to the naked eye.” Id. at 285, 103 S.Ct. 1081. Similar to the circumstances in Knotts, Skinner was traveling on a public road before he stopped at a public rest stop. While the cell site information aided the police in determining Skinner’s location, that same information could have been obtained through visual surveillance.
There is no inherent constitutional difference between trailing a defendant and tracking him via such technology. Law enforcement tactics must be allowed to advance with technological changes, in order to prevent criminals from circumventing the justice system. The Supreme Court said as much in Knotts, noting that, “[i]nsofar as respondent’s complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now.” Id. at 284, 103 S.Ct. 1081. In drawing this conclusion, the Court discussed Smith v. Maryland, 442 U.S. 735, 744-45, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), where a defendant was found to have no reasonable expectation of privacy in the numbers he dialed on his phone, even after that information was automated by the phone company. The Court compared this technology to giving the numbers to a telephone operator, where they would not be confidential: “We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate.” Knotts, 460 U.S. at 283, 103 S.Ct. 1081. Similar reasoning compels the conclusion here that Skinner did not have a reasonable expectation of privacy in the location of his cell phone while traveling on public thoroughfares.
Skinner’s case also falls squarely within this court’s precedent in United States v. Forest, 355 F.3d 942 (6th Cir.2004). In Forest, DEA agents had lost visual contact of the defendant as he traveled on public roads to meet two suspected drug couriers. To reestablish contact, agents called the defendant’s cell phone, hanging up before it rang, in order to “ping” or gather data on the phone’s physical location. Using this information, agents were able to determine the defendant’s movements along a public roadway, and ultimately to arrest the defendant at a gas station the following day. We held that such monitoring did not violate the Fourth Amendment because, as in Knotts, “the DEA agents could have obtained the same information by following [the defendant’s] car.” Id. at 951. “Although the DEA agents were not able to maintain visual contact with [the defendant’s] car at all times, visual observation was possible by any member of the *779 public. The DEA agents simply used the cell-site data to ‘augment[] the sensory faculties bestowed upon them at birth,’ which is permissible under Knotts.” Id. (quoting Knotts, 460 U.S. at 282, 103 S.Ct. 1081). The same is true in Skinner’s case.
In Forest, we also rejected the argument that even if a defendant does not have a legitimate expectation of privacy regarding his location, he does have a legitimate expectation of privacy in the cell site data itself. Forest, 355 F.3d at 951-52. Because “the cell-site data is simply a proxy for [the defendant’s] visually observable location,” and a defendant has “no legitimate expectation of privacy in his movements along public highways,” we concluded, as we do here, that “the Supreme Court’s decision in Knotts is controlling, and [thus] the DEA agents did not conduct a search within the meaning of the Fourth Amendment.” Id.
Skinner counters that, unlike Knotts and Forest, the DEA agents in his case had never established visual surveillance of his movements, did not know his identity, and did not know the make or model of the vehicle he was driving (although they did know it was a motorhome that was accompanied by a pickup truck). Skinner argues that, in this instance, technology was used to supplement, not “augment,” the “sensory faculties” of the agents. But even if the agents in Knotts and Forest momentarily had visual contact of the defendant, and then relied on technology either to reestablish contact or to learn where to initiate visual observation, this was not critical to our analysis. Therefore, no real distinction exists in Skinner’s case. In all three instances the defendant’s movements' could have been observed by any member of the public, a crucial fact for this court in Forest. As for not knowing his identity, this is irrelevant because the agents knew the identity of Skinner’s co-conspirators and could have simply monitored their whereabouts to discover Skinner’s identity. Using a more efficient means of discovering this information does not amount to a Fourth Amendment violation. In any event, we determine whether a defendant’s reasonable expectation of privacy has been violated by looking at what the defendant is disclosing to the public, and not what in- ■ formation is known to the police.
Although not necessary to find that there was no Fourth Amendment violation in this case, the Government’s argument is strengthened by the fact that the authorities sought court orders to obtain information on Skinner’s location from the GPS capabilities of his cell phone. The government received authorization from the magistrate judge to receive location information from the cell phone company so that agents could locate and track Skinner’s vehicle that was carrying the load of marijuana. When the first cell phone number turned out to be with West in North Carolina, authorities then sought and obtained a second order from the magistrate judge to “ping” the second cell phone number and locate the drugs while they were still en route.
This case is different from the recent Supreme Court decision in United States v. Jones, — U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). That case involved the secret placement of a tracking device on the defendant’s car, id. at 948, and the Court’s opinion explicitly relied on the trespassory nature of the police action. Id. at 949. Although Fourth Amendment jurisprudence includes an assessment of the defendant’s reasonable expectation of privacy, that “d[oes] not erode the principle ‘that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute *780 a violation of the Fourth Amendment.’ ” Id. at 951 (quoting Knotts, 460 U.S. at 286, 103 S.Ct. 1081 (Brennan, J., concurring)). No such physical intrusion occurred in Skinner’s case. Skinner himself obtained the cell phone for the purpose of communication, and that phone included the GPS technology used to track the phone’s whereabouts. The majority in Jones based its decision on the fact that the police had to “physically oecup[y] private property for the purpose of obtaining information.” 132 S.Ct. at 949. That did not occur in this case. Indeed, the Jones opinion explicitly distinguished Knotts on this ground — that trespass was not an issue in Knotts — and in no way purported to limit or overrule the Court’s earlier holding in Knotts. Id. at 951-52. Moreover, Jones does not apply to Skinner’s case because, as Justice Sotomayor stated in her concurrence, “the majority opinion’s trespassory test” provides little guidance on “cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property.” Id. at 955 (Sotomayor, J., concurring).
Skinner’s case also does not present the concern raised by Justice Alito’s concurrence in Jones, 132 S.Ct. at 957-64. There may be situations where police, using otherwise legal methods, so comprehensively track a person’s activities that the very comprehensiveness of the tracking is unreasonable for Fourth Amendment purposes. As Justice Alito recognized, • prior to certain advances in technology, “practical” considerations often offered “the greatest protections of privacy.” Id. at 963. For instance, in the situation presented in Jones, “constant monitoring of the location of a vehicle for four weeks ... would have required a large team of agents, multiple vehicles, and perhaps aerial assistance.” Id. Technology, ■ howéver, has made it possible to conduct a level of extreme comprehensive tracking, “secretly monitoring] and cataloguing] every single movement” that the defendant made over four weeks, that previously would have been impossible. Id. at 964.
No such extreme comprehensive tracking is present in this case. Justice Alito’s concurrence and the majority in Jones both-recognized that there is little precedent for what constitutes a level of comprehensive tracking that would violate the Fourth Amendment. Id. at 954, 964. Skinner’s case, however, comes nowhere near that line. While Jones involved intensive monitoring over a 28-day period, here the DEA agents only tracked Skinner’s cell phone for three days. Such “relatively short-term monitoring of a person’s movements on public streets accords with expectations of privacy that our society has recognized as reasonable.” Id. at 964 (Alito, J., concurring) (citing Knotts, 460 U.S. at 281-82, 103 S.Ct. 1081). Here, the monitoring of the location of the contraband-carrying vehicle as it crossed the country is no more of a comprehensively invasive search than if instead the car was identified in Arizona and then tracked visually and the search handed off from one local authority to another as the vehicles progressed. That the officers were able to use less expensive and more efficient means to track the vehicles is only to their credit.
The Supreme Court in Jones also distinguished its previous holding in United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), that the installation of a beeper in a container did not constitute a search or seizure, as follows:
The Government, we said [in Karo ], came into physical contact with the container only before it' belonged to the defendant Karo; and the transfer of the container with the unmonitored beeper *781 inside did not convey any information and thus did not invade Karo’s privacy. That conclusion is perfectly consistent with the one we reach here. Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper’s presence, even though it was used to monitor the container’s location.
Jones, 132 S.Ct. at 952 (internal citation omitted). The same distinction applies even more strongly here: the Government never had physical contact with Skinner’s cell phone; he obtained it, GPS technology and all, and could not object to its presence.
Because authorities tracked a known number that was voluntarily used while traveling on public thoroughfares, Skinner did not have a reasonable expectation of privacy in the GPS data and location of his cell phone. Therefore, suppression is not warranted and the district court correctly denied Skinner’s motion to suppress.
B. Sufficiency of the Evidence for Conspiracy to Commit Money Laundering
There was sufficient evidence for a reasonable trier of fact to convict Skinner of conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)© and 1956(h). Section 1956(a)(1)(A)© provides for criminal penalties against any person who, “knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity.” In this case, Skinner knowingly and routinely transported drug receipts to Arizona so that he could pay off prior debts related to the drug-trafficking conspiracy, and obtain additional marijuana in furtherance of the conspiracy. In considering Skinner’s insufficiency of the evidence claim, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). The record clearly supports the jury’s verdict that Skinner was guilty of conspiracy to commit money laundering.
Skinner argues that the drug receipts he transported were not “profits” and therefore were not “proceeds” under the money laundering statute. He relies on the definition of “proceeds” as “profits” discussed in United States v. Santos, 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008). In Santos, the Supreme Court held that a money-laundering conviction of a man involved in an illegal gambling operation was improper because, based on the facts of that case and relying on the rule of lenity, “proceeds” under § 1956(a)(1) meant “profits” and not “receipts.” Id. at 514, 128 S.Ct. 2020.
But as we explained in United States v. Crosgrove, 637 F.3d 646 (6th Cir.2011), “proceeds” means “profits” only where the “predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and ... nothing in the legislative history suggests that Congress intended such an increase.” Id. at 654-55 (quoting United States v. Kratt, 579 F.3d 558, 562 (6th Cir.2009)). In other cases, “proceeds” can still include gross receipts. Crosgrove, 637 F.3d at 654. We so held in a case involving receipts from bank fraud in United States v. Kratt, 579 F.3d 558 (6th Cir.2009). As Skinner’s case does not present a merger problem, the gross re *782 ceipts in Skinner’s case are proceeds, and there was sufficient evidence to convict Skinner of conspiracy to commit money laundering.
Skinner’s case does not present a merger problem. “Under the Santos-Kratt framework, a merger problem arises when defining ‘proceeds’ as ‘receipts’ automatically makes commission of the predicate offense a commission of money laundering and where the predicate offense carries a much lower statutory maximum sentence than the associated money laundering charge.” Crosgrove, 637 F.3d at 655 (citing Kratt, 579 F.3d at 563). In this case, Skinner was indicted, tried, and convicted on three charges: Conspiracy to Distribute and Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana (“Count I”); Conspiracy to Commit Money Laundering (“Count II”); and Aiding and Abetting in the Attempt to Distribute in Excess of 100 Kilograms of Marijuana (“Count III”). Regardless of which drug charge is considered the “predicate offense” for the purposes of Skinner’s merger argument under Santos, both carry heavier maximum penalties under their corresponding statutes than does the money laundering charge. Count I, the drug conspiracy charge, is a Class A Felony carrying a mandatory minimum of 10 years to life imprisonment. Count III, the aiding and abetting drug charge, is a Class B Felony carrying a mandatory minimum of 5 years’ up to 40 years’ imprisonment. The money laundering charge listed in Count II is a Class C Felony with a statutory maximum sentence of 20 years, and for this charge there is no mandatory minimum. Skinner therefore cannot rely on Santos because, under Kratt and Crosgrove, conviction of the money laundering charge did not result in a radical increase in his statutory maximum sentence.
In any event, we have already held in the drug-trafficking context that “proceeds” are not limited to “profits.” In United States v. Smith, 601 F.3d 530 (6th Cir.2010), we explained that Justice Stevens, who was the necessary fifth vote in Santos, made it clear in his concurring opinion that “the predicate offense of conspiracy to distribute cocaine does not fall within the category of offenses for which ‘proceeds’ means ‘profits.’ ” Id. at 544 (citing Santos, 553 U.S. at 526 n. 3, 128 S.Ct. 2020). In refusing to hold that “proceeds” under the money-laundering statute must always mean “profits,” Justice Stevens “stated specifically that ‘the legislative history of § 1956 makes it clear that Congress intended the term ‘proceeds’ to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales,’ and he stated that he did not agree with the plurality that ‘the rule of lenity must apply to the definition of ‘proceeds’ for these types of unlawful activities.’ ” Smith, 601 F.3d at 544 (citing Santos, 553 U.S. at 525-26 n. 3, 128 S.Ct. 2020). Therefore, “[a] majority of the Court (Justice Stevens plus the dissenting Justices) explicitly preserved the possibility that ‘proceeds’ does not necessarily mean ‘profits’ when a member of a drug conspiracy is prosecuted under § 1956.” Smith, 601 F.3d at 544.
Viewing the evidence in the light most favorable to the prosecution, and interpreting “proceeds” to include “gross receipts,” as dictated by our precedent, there was sufficient evidence for a rational trier of fact to convict Skinner of conspiracy to commit money laundering. Skinner knowingly and routinely transported drug proceeds in furtherance of the drug-trafficking conspiracy, and he was aware that he was paying Apodaca with West’s drug money in order to obtain more drugs to transport to Tennessee.
*783 C. No Mitigating Role Reduction
At sentencing, the district court did not err in denying a mitigating role reduction under U.S.S.G. § 3B1.2, because Skinner’s role as courier was critical to the success of the drug trafficking and money laundering conspiracies. To receive a reduction, Skinner was required to “prov[e] ... by a preponderance of the evidence ... that he played a relatively minor role in conduct for which he was held accountable,” United States v. Sheafe, 69 Fed.Appx. 268, 270 (6th Cir.2003). See also United States v. Groenendal, 557 F.3d 419, 427-28 (6th Cir.2009). The district court did not err in denying the mitigating role adjustment, which authorizes a four-level reduction in offense level if the defendant is deemed a “minimal” participant in the criminal activity, a two-level reduction if he is deemed a “minor” participant, and a three-level reduction if he falls somewhere in between. See U.S.S.G. § 3B1.2.
The district court determined that Skinner was responsible for 12,611 pounds of marijuana, the amount he actually delivered or transported, not the total amount of drugs transported throughout the entire conspiracy. Since November 1, 2001, the Sentencing Commission has said that a defendant is not precluded from being considered for a mitigating role reduction simply because he is held accountable only for the quantity of drugs attributable to him. U.S.S.G. § 3B1.2 cmt. n.3(A). However, while Skinner is eligible for a mitigating role reduction, this determination is left to the discretion of the district court, which in this instance did not clearly err in denying the reduction in light of Skinner’s instrumental role in the conspiracies.
As a courier, Skinner’s role in the conspiracy was critical to its success. “[T]he critical question in whether to grant a ‘mitigating role’ reduction is what role the defendant played in relation to others involved in the criminal enterprise.” United States v. Henderson, 307 Fed.Appx. 970, 983 (6th Cir.2009) (citing United States v. Campbell, 279 F.3d 392, 396 (6th Cir.2002)). At sentencing, the district court determined that Skinner “facilitated the transportation of vast amounts of marijuana and money back and forth across the country,” and “[t]he conspiracy would not have been successful without the participation of the drivers.... [Tjhis defendant facilitated and allowed this conspiracy to progress.... -That is more than just a minor or minimum player.” There is nothing in the record to suggest that these determinations were clearly erroneous, and they justify the district court’s denial of the mitigating role adjustment. See Campbell, 279 F.3d at 396 (stating clearly erroneous standard for factual determinations).
Although Skinner argues that he should be granted the mitigating role reduction because he did not have a “high degree of culpability” in the conspiracy and because his role was largely limited to that of a courier or “mule,” we affirmed the district court’s denial of a mitigating role adjustment in a case factually similar to Skinner’s. In Sheafe, the defendant was charged with several narcotics-related offenses due to his participation as the driver in three inter-state shipments of cocaine. 69 Fed.Appx. at 269. We rejected Sheafe’s “protestations that he was a lowly courier” and determined it to be “immaterial that Sheafe was not the owner of the cocaine or the leader or organizer of the drug transaction. A defendant does not qualify for a mitigating role reduction merely because someone else planned the scheme and made all the arrangements.” Id. at 270 (citation omitted). Rather, we determined that a “defendant who plays a lesser role in a criminal scheme may nonetheless fail to qualify as a minor partid *784 pant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence.” United States v. Salgado, 250 F.3d 438, 458 (6th Cir.2001) (citation omitted). As in Skinner’s case, in Sheafe’s case “the conspiracy could not have succeeded without someone to transport the [drugs].” Sheafe, 69 Fed.Appx. at 270. The district court, therefore, could properly determine that Skinner played a critical role in the drug-trafficking and money-laundering conspiracies.
III.
The judgment of the district court is affirmed.

. We do not mean to suggest that there was no reasonable expectation of privacy because Skinner's phone was used in the commission of a crime, or that the cell phone was illegally possessed. On the contrary, an innocent actor would similarly lack a reasonable expectation of privacy in the inherent external locatability of a tool that he or she bought.