RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONTAI RILEY,

*Defendant-Appellant.*

No. 16-6149

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:15-cr-20242-1—Sheryl H. Lipman, District Judge.

Argued: March 16, 2017

Decided and Filed: June 5, 2017

Before: BOGGS, ROGERS, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Claiborne H. Ferguson, THE CLAIBORNE FERGUSON LAW FIRM, P.A., Memphis, Tennessee, for Appellant. Ashley C. Brown, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Claiborne H. Ferguson, THE CLAIBORNE FERGUSON LAW FIRM, P.A., Memphis, Tennessee, for Appellant. Marques T. Young, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

The court delivered a PER CURIAM opinion. BOGGS, J. (pp. 10–17), delivered a separate concurring opinion.

———————

**OPINION**

———————

PER CURIAM.  This case calls upon us to clarify the rules by which police may seek to find miscreants: When a fugitive subject to an arrest warrant for armed robbery hides in a motel, may the government track his cell phone's GPS coordinates to locate and arrest him?

Yes, the district court held—and we affirm, holding that the government's detection of Montai Riley's whereabouts in this case, which included tracking Riley's real-time GPS location data for approximately seven hours preceding his arrest, did not amount to a Fourth Amendment search under our precedent in *United States v. Skinner*, 690 F.3d 772, 781 (6th Cir. 2012).  The government used Riley's GPS location data to learn that Riley was hiding out at the Airport Inn in Memphis, Tennessee—but only *after* inquiring of the front-desk clerk did the government ascertain Riley's specific room number in order to arrest him.  The GPS tracking thus provided no greater insight into Riley's whereabouts than what Riley exposed to public view as he traveled "along public thoroughfares," *id.* at 774, to the hotel lobby.  Therefore, under *Skinner*, Riley has no reasonable expectation of privacy against such tracking, and the district court properly denied Riley's motion to suppress evidence found upon Riley's arrest.

**I**

On June 23, 2015, a state court in Kent County, Michigan, issued an arrest warrant for Riley, having found probable cause to believe that he had committed armed robbery of a local Check 'n Go store on June 22.  Riley had allegedly entered the store, pointed a gun at the clerk, instructed her to open the safe, and fled on foot with a "money box and money bags."  On June 25, Riley purchased a cell phone serviced by AT&T.  A member of Riley's family gave this phone's telephone number to Riley's girlfriend "so she could contact him while he was 'on the run.'"  Riley's girlfriend in turn disclosed the number to Special Deputy Joel Bowman, a member of the United States Marshal Service Grand Rapids Apprehension Team.  On June 26, Bowman applied for and received an order from the 17th Circuit Court of Kent County,

Michigan, compelling AT&T to produce telecommunications records of Riley's cell phone under federal electronic-surveillance laws. *See* 18 U.S.C. §§ 2703, 3123, 3124.

The court order compelled disclosure of call metadata such as inbound and outbound phone numbers and cell-site location (CSL) data, as well as real-time tracking[1] or "pinging" of the latitude and longitude coordinates of Riley's phone. Specifically, the order required AT&T to disclose the following, potentially for two months, until August 26, 2015:

> 16. Precision location of mobile device (GPS Location) such that service provider shall initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonable [sic] available and a [sic] such intervals and times as directed by State Task Force Investigators and Deputy Marshals of the United States Marshal Service.

---

[1]Cell-phone location tracking refers to all methods of tracking a cell phone, including gathering cell-site location information (commonly referred to as CSL or CSLI) and tracking satellite-based Global Positioning System (GPS) data. CSL data are generated when a cell phone connects with a cell tower in order to make or receive a call; a phone may connect to and disconnect from multiple towers during the course of a phone call if, for example, the caller is in motion during the call. GPS data, on the other hand, do not come from a cell tower. Rather, GPS data reveal the latitude and longitude coordinates of the cell phone, regardless of whether a call is in progress, as identified by satellites orbiting the Earth that connect to the phone. A cell phone's GPS location can be identified so long as the phone has GPS functionality installed (as smartphones almost universally do), the phone is turned on, and the GPS functionality is not disabled. Finally, "pinging" is a word that may refer in some contexts to a cell phone's connecting to a cell tower (*e.g.*, "the phone pinged the tower"), and in other contexts to a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own (*e.g.*, "AT&T pinged the phone").

In line with the practice of other courts that have discussed cell-phone tracking, we use "pinging" only in the latter sense: to ping a cell phone is to send a signal, so to speak, to identify where the phone is at any given moment. While pinging may in some cases employ CSL information (for example, by triangulating the location of a phone while a call is in progress by using data gathered from multiple cell towers), the pinging at issue in this case, as in most recent cases, involves only real-time collection of GPS data.

Within hours of the issuance of the surveillance order, U.S. Marshals received real-time GPS data revealing that Riley's phone was located at the Airport Inn in Memphis.**2** Task-force deputies in the Marshals' Memphis office went to the motel, showed the front-desk clerk a picture of Riley, and determined that Riley had checked in under the name "Rico Shawn Lavender" and was in Room 314. The deputies went to Riley's room and knocked. Riley opened the door and immediately attempted to shut it, but the deputies entered the room and arrested Riley at some time between 8:50 and 9:00 p.m. A Smith & Wesson .22-caliber pistol was in plain view on the bed, and Riley was subsequently indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## II

Following his arrest in Memphis, Riley was extradited to Wyoming, Michigan, where, on October 6, 2015, he was sentenced in state court to 7.5 to 25 years of imprisonment for armed robbery, with an earliest release date of January 13, 2023, and a latest discharge date of July 13, 2040. He then returned to the United States District Court for the Western District of Tennessee to answer his federal firearm-possession charge. Riley twice moved to compel the government to disclose information on how the government located Riley so quickly, asserting that "[t]here was no known legal way that Mr. Riley's location could have been located absent the use of

---

**2**AT&T provided the cell phone's GPS coordinates at various times, the first twenty-two of which are detailed below. No evidence of record indicates whether Riley's phone automatically transmitted its GPS coordinates to AT&T (and if so, whether on a continuous basis or otherwise) or whether AT&T affirmatively sent a signal to Riley's phone to cause it to send AT&T its GPS coordinates. When viewed on a map, the majority of these coordinates are scattered within the perimeter of the Airport Inn, but with insufficient precision—even if the Airport Inn were only one story tall—to reveal which room, if any, the phone was in at the time of each ping.

| Time | Latitude (° North) | Longitude (° West) | Time | Latitude (° North) | Longitude (° West) |
|---|---|---|---|---|---|
| 1:45:28 p.m. | 35.061626 | 90.014795 | 4:47:50 p.m. | 35.060328 | 90.01649 |
| 2:01:37 p.m. | 35.061584 | 90.014859 | 5:03:39 p.m. | 35.060425 | 90.016597 |
| 2:17:51 p.m. | 35.060446 | 90.016597 | 5:25:26 p.m. | 35.060489 | 90.016726 |
| 2:33:41 p.m. | 35.060479 | 90.016683 | 5:41:30 p.m. | 35.060489 | 90.016511 |
| 2:49:31 p.m. | 35.060511 | 90.016683 | 5:57:28 p.m. | 35.060178 | 90.01664 |
| 3:05:24 p.m. | 35.061294 | 90.015288 | 6:14:04 p.m. | 35.060393 | 90.01679 |
| 3:21:43 p.m. | 35.060393 | 90.016618 | 6:29:53 p.m. | 35.061755 | 90.01458 |
| 3:41:40 p.m. | 35.060403 | 90.016661 | 6:47:14 p.m. | 35.060232 | 90.017627 |
| 4:00:08 p.m. | 35.060414 | 90.016468 | 7:04:51 p.m. | 35.060543 | 90.016425 |
| 4:16:04 p.m. | 35.060382 | 90.016618 | 7:30:40 p.m. | 35.060307 | 90.016747 |
| 4:31:58 p.m. | 35.06035 | 90.016747 | 7:46:32 p.m. | 35.060403 | 90.016618 |

illegal cell tracking technology," and that disclosure was required to allow Riley to bring a constitutional challenge to whatever technology was used. The district court granted Riley's second motion to compel.

Attaching copies of the state court's surveillance order, Riley moved to suppress the pistol found in his motel room as the fruit of an unconstitutional search, arguing that whatever method the government had used to find him—whether by GPS pinging, a "cell-site simulator" such as a "DirtBox, Stingray, etc.," or otherwise, Mot. to Suppress, R. 35 at 3—intruded upon Riley's reasonable expectation of privacy and thus required a search warrant.[3] The government opposed the motion, including with its response a fourteen-page exhibit listing the GPS coordinates of Riley's cell phone on 454 occasions starting June 26, 2015, and ending June 30, 2015. The first twenty-two entries are listed above. *Ante*, at n.2. On average, AT&T logged approximately one "ping" every thirteen minutes, although, of course, Riley was arrested on the first day of the tracking.

The district court denied the motion on two alternative bases: first, on the ground that our decision in *Skinner* justified short-term GPS tracking without a warrant; second, on the ground that the warrant that had been issued for Riley's arrest justified obtaining real-time GPS information about Riley's location in order to effectuate his arrest. Riley pleaded guilty to being a felon in possession of a firearm, reserving his right to appeal the denial of his motion to suppress, and was sentenced to forty-one months of imprisonment to run concurrently with his state sentence but with a delayed start date of February 13, 2022.

The sole question before us is whether the district court erred in holding that the government did not violate Riley's Fourth Amendment rights by compelling AT&T to disclose, and then by subsequently using, the real-time GPS location of Riley's cell phone over the course

---

[3]The parties agree that the state court's surveillance order, despite being issued pursuant to federal electronic-surveillance laws, was not a valid search warrant that would on its own justify tracking Riley's location data.

of approximately seven hours.[4]  Because the sort of short-term tracking conducted here falls squarely within the logic of our precedent in *Skinner*, we affirm.

**III**

The Fourth Amendment protects individuals against unreasonable searches and seizures of their "persons, houses, papers, and effects."  Law-enforcement officers conduct a "search" when they seek to obtain information in either of two ways: (1) by physically trespassing upon an individual's person, house, papers, or effects, *see United States v. Jones*, 565 U.S. 400, 406–07 (2012) (holding GPS tracking of a vehicle for twenty-eight days was a search when agents physically trespassed upon the vehicle to install the tracking device), or (2) by intruding upon an individual's reasonable expectation of privacy, *see Katz v. United States*, 389 U.S. 347, 360–62 (1967) (Harlan, J., concurring) (holding eavesdropping on a payphone conversation by means of an electronic listening and recording device, when the payphone door was closed, was a search; noting "reasonable expectations of privacy may be defeated by electronic as well as physical invasion").  Riley does not argue that the government committed a *physical* trespass of any sort, and we decline to consider whether pinging a cell phone may constitute an *electronic* trespass,[5] so only the 'reasonable expectation of privacy' test is applicable here.

Both the Supreme Court and our court have declined to recognize as reasonable a criminal suspect's expectation of privacy in his location while moving along public thoroughfares.  *See United States v. Knotts*, 460 U.S. 276, 279–80 (1983) (holding the placement of a radio transmitter by narcotics officers in a container of chemicals to be purchased by a suspected methamphetamine manufacturer was not a search when officers used the transmitter to

---

[4]Riley also attempts to raise a statutory argument on appeal.  As the district court recognized, the statutes that Riley relies upon only provide mechanisms for authorizing access to certain cell-phone data and do not prohibit the government from otherwise tracking an individual's GPS location data.  Thus, the statutes cannot provide Riley with the remedy he seeks—suppression of the evidence against him.

[5]At oral argument, Riley sought to advance an argument that the government, by initiating a signal to Riley's cell phone rather than merely gathering data that the cell phone emitted on its own, had committed an electronic or digital trespass that was technologically distinguishable from the tracking in *Skinner*.  This argument was not raised in Riley's brief on appeal, however, and thus it is not properly before us.  Moreover, *Skinner* expressly contemplated tracking "cell site information, GPS real-time location, and 'ping' data," 690 F.3d at 776, and there is nothing in the record before us to indicate that the tracking here is technologically distinct from the tracking that occurred in *Skinner*.

track a vehicle while it carried the transmitter along public roads to a cabin, but when the transmitter did not enter the cabin itself); *United States v. Skinner*, 690 F.3d 772, 774–75, 776 (6th Cir. 2012) (holding government use of real-time cell-phone GPS data to track a suspected drug trafficker as he traveled for three days in a "motorhome that was driven on public roads" was not a search).

In *Skinner*, we held that location data emitted by a "voluntarily procured" cell phone could not be subject to a reasonable expectation of privacy, even if the cell-phone user had no reason to expect that the government would compel the service provider to disclose those data. *Id.* at 779. There, because "the defendant's movements could have been observed by any member of the public," *ibid.*, we held that it could not possibly be a Fourth Amendment violation for law-enforcement officers to monitor those movements by using cell-phone location data just because such electronic monitoring was more efficient than relying on visual surveillance alone.

The fact that the defendant's movements in *Skinner* were visible from public vantage points was an important factor in our reasonable-expectation-of-privacy analysis. Entering an individual's *home* to observe his movements, even if by technological device rather than physically, would much more likely raise Fourth Amendment concerns in light of the common law's protection of the home against government intrusion. As William Pitt, Earl of Chatham, reportedly proclaimed during a debate in Parliament in 1763: "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" The Oxford Dictionary of Quotations (2d ed. 1953), 379, *quoted in Miller v. United States*, 357 U.S. 301, 307 (1958). The two-and-a-half intervening centuries have seen little jurisprudential erosion of this tenacious reverence for the sanctity of the home.

The Supreme Court has made very clear, for example, that "obtaining by sense-enhancing technology any information regarding *the interior of the home* that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' constitutes a search." *Kyllo v. United States*, 533 U.S. 27, 35 (2001) (emphasis added) (citation omitted) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)) (holding government use of

thermal-imaging devices to monitor the heat being produced inside a home as part of a strategy to detect indoor marijuana growing was a search where the devices were unavailable to the general public, even though the devices were used only from outside the home without effecting a physical trespass); *United States v. Karo*, 468 U.S. 705, 708–09, 713–15 (1984) (holding government monitoring of a tracking device placed in a shipment of chemicals taken home by a suspected drug dealer was a search where the agents tracked the device to locate the chemicals, on several occasions, within the defendant's house and various other private residences; distinguishing *Karo* from *Knotts* on the sole basis that unlike in *Knotts*, in which "the record did not show that the beeper was monitored while the can containing it was *inside the cabin*," the government in *Karo* had "surreptitiously employ[ed] an electronic device to obtain information" about the interior of "a private residence, a location not open to visual surveillance," in a way that was not feasible without the aid of the device) (emphasis added).

Searches "inside a home without a warrant are presumptively unreasonable." *Karo*, 468 U.S. at 715; *see also Silverman*, 365 U.S. at 511 (holding that the right to privacy at home is "[a]t the very core" of what the Fourth Amendment seeks to protect). And the Fourth Amendment's full complement of protections "also applies to hotel rooms." *United States v. Allen*, 106 F.3d 695, 698 (6th Cir. 1997) (citing *Hoffa v. United States*, 385 U.S. 293, 301 (1966)).

But using seven hours of GPS location data to determine an individual's location (or a cell phone's location), so long as the tracking does not reveal movements *within* the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search. After all, the tracking in *Knotts* revealed the location of the cabin *to which* the criminal suspects had traveled—but the tracking in *Knotts* was not a search because it revealed no information about the *interior* of the cabin itself. Likewise here, the tracking revealed only that Riley had traveled *to* the Airport Inn, not which *room* (if any) the phone was in at the time of the tracking. And the tracking in *Karo*, while a search to the extent that the tracking device there was monitored *within* private residences, was not a search at other times, such as when the tracking device was monitored in one of the defendant's vehicles "on its trip . . . *to the immediate vicinity of*" a private residence. 468 U.S. at 719 (emphasis added).

Therefore, the government did not conduct a search under the Fourth Amendment when it tracked the real-time GPS coordinates of Riley's cell phone on the date of Riley's arrest. *Skinner* upheld tracking that spanned three days; here, approximately seven hours elapsed between the first ping and the time of Riley's arrest. That Riley was arrested in a motel is of no moment, for the government learned no more about Riley's whereabouts from tracking his cell-phone GPS data than what Riley exposed to public view by traveling *to the motel lobby* "along public thoroughfares," *Skinner*, 690 F.3d at 774—even if Riley meant to keep his location a secret, one cannot expect privacy in one's *public* movements. And had Riley truly wished to avoid detection, he could have chosen not to carry a cell phone at all, or to *turn it off*. The district court thus correctly denied Riley's motion to suppress.

**AFFIRMED**.

---

## CONCURRENCE

---

BOGGS, Circuit Judge, concurring.

### I

I write separately to highlight certain additional factors at play in this case that provide additional comfort that our holding today is correct.

At oral argument, the government conceded that if the GPS tracking had been precise enough to identify a specific home or motel *room* in which Riley was hiding—rather than a motel generally—*Kyllo* and *Karo* may have presented greater concerns:

> I think that, if these coordinates had been sufficient to identify a home or a hotel room, this could be a different case, but I think the fact here that the coordinates only get the police officers to the hotel lobby, essentially, and they then have to do additional work in terms of figuring out exactly what hotel room he's in, makes this case different from if he had been identified in his home, and makes this case more akin to *Skinner*.

Tr. of Oral Arg. 20:06-20:35.

But our precedent in *Skinner* governs because the tracking here brought the law-enforcement officers only as far as the lobby of the Airport Inn—a public area—and the officers then had to ask the front-desk clerk to determine Riley's whereabouts within the confines of a specific hotel room.

I would note that in cases like Riley's, even tracking GPS data *within* a home or a hotel room may fail to rise to the level of a Fourth Amendment search when the individual whose cell-phone location is tracked is a fugitive subject to a valid arrest warrant, and when the law-enforcement officers tracking him have at least reasonable suspicion that he is in possession of the phone being tracked. Thus, for the reasons that follow, I would hold that Riley's Fourth Amendment claim fails, alternatively, because he was a fugitive subject to a valid arrest warrant, and because the officers here had reasonable suspicion that he was in possession of the phone that they were tracking.

**A. The Third-Party Doctrine**

Supplementing the general Fourth Amendment unreasonable-search framework based on the Supreme Court's rulings in *Katz* and *Jones* is the so-called third-party doctrine, according to which one can have no reasonable expectation of privacy in information knowingly disclosed to a third party, and thus no Fourth Amendment claim can lie for the acquisition and use by law-enforcement agents of such information. *See United States v. Miller*, 425 U.S. 435, 441–43 (1976) (holding government-compelled disclosure of "a depositor's private [bank] records" was not a Fourth Amendment search because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed"); *Smith v. Maryland*, 442 U.S. 735, 742 (1979) (holding government-compelled installation of a pen register to track phone numbers dialed from a specified telephone-service subscriber's landline phone was not a search where the pen register was installed on the telephone company's property and where the outbound phone numbers were voluntarily disclosed to the telephone company and therefore could not reasonably be considered private).

But *Kyllo*, decided well after both *Miller* and *Smith*, expressly rejected the notion that the government's use of thermal-imaging devices to detect heat within the defendant's home could be justified on the ground that the defendant "exposed" his activity "to the public" by emitting heat waves that could be detected from a public vantage point. *Kyllo*, 533 U.S. at 44 (Stevens, J., dissenting) (drawing analogies between heat waves that "enter the public domain if and when they leave a building" and discarded garbage, *California v. Greenwood*, 486 U.S. 35, 45 (1988), pen-register data, *Smith*, 442 U.S. at 742, and subpoenaed utility records). In short, the third-party doctrine does not lay bare to Big Brother's watchful eye *every* activity conducted within the home just because someone outside the home might be able to detect its occurrence. The third-party doctrine, therefore, would likely be insufficient on its own to support government-compelled tracking of location data that revealed movements within a home or hotel room.

**B. The Fugitive–Suspect Distinction**

A key distinction between this case and *Kyllo*, *Karo*, *Knotts*, and *Skinner*, which further supports our holding, is that the government tracked Riley's cell phone only *after* a valid warrant for his arrest had already been issued, whereas the defendants in *Kyllo*, *Karo*, *Knotts*, and *Skinner* were criminal *suspects* but not *fugitives*. And although the text of the Fourth Amendment does not itself imply that individuals on the run from arrest warrants have a diminished expectation of privacy, the Supreme Court's decision in *Payton v. New York*, 445 U.S. 573 (1980), as corroborated by significant historical evidence of the original meaning of the Fourth Amendment, provides strong support for the proposition that they do. *Id.* at 592–96, 603 (holding that where law-enforcement officers have a valid *arrest* warrant and reasonably suspect that the individual subject to arrest is inside his home, they may enter the home and arrest the individual without first obtaining a *search* warrant to do so).

The logic in *Payton* is that the Fourth Amendment requires the government to obtain a warrant before entering the arrestee's home, but whether the warrant must be an arrest warrant or a search warrant is not a question answered definitively by the constitutional text, and in the case of a fugitive subject to a valid arrest warrant, the arrest warrant "will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen." *Id.* at 602–03 ("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.").

Surely, if the issuance of a valid arrest warrant may reasonably require an individual to open the doors of his *home*, which stands at the "very core" of Fourth Amendment protection, *Silverman*, 365 U.S. at 511, then it may reasonably require the same individual to open the doors of his *phone*—at least so far as to disclose the longitude and latitude coordinates emitted by a phone that the individual chooses to carry and turn on. Allowing law-enforcement agents to track a fugitive's cell-phone location data, including GPS location data within the home, thus falls well within the logic of *Payton* without contravening *Kyllo* or *Karo*: so long as a valid arrest warrant has been issued, law-enforcement officers who reasonably suspect that a cell phone is in

the possession of the subject of the warrant may track that cell phone's location in order to facilitate the execution of the warrant, without implicating the Fourth Amendment.

**C. Factors Weighing Against the Fugitive's Expectation of Privacy in GPS Location Data**

Several considerations, none of which is independently sufficient, support the proposition that a cell-phone service provider's records of a fugitive's cell-phone location data are not private for Fourth Amendment purposes.

First, the subject of the surveillance is a fugitive. While a fugitive does not forfeit all his expectation of privacy—after all, under *Payton*, law-enforcement officers may not simply break into a fugitive's home to arrest him without at least some reason to believe that the fugitive is inside—the most compelling factor in favor of allowing the government to track a fugitive's cell phone regardless of the phone's location is that the fugitive is the subject of a valid arrest warrant.

In addition to the rule in *Payton*, which allows officers to enter an arrestee's home to effectuate the arrest with only reasonable suspicion that the arrestee is at home, the Supreme Court has held that law-enforcement officers in "hot pursuit" of their quarry have a limited right to enter private homes without a search warrant. *See Warden v. Hayden*, 387 U.S. 294, 298, 310 (1967) (holding exigent circumstances validated warrantless entry into a home to search for a suspected armed robber who had reportedly entered less than five minutes earlier). There is some historical support for holding that a fugitive's expectation of privacy at home is diminished as well: at common law, officers may have had at least some authority enter a home to execute an arrest warrant after first making a demand. *See Payton*, 445 U.S. at 616 (citing *Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B.) (1603)) ("[I]n cases of felony, the officers were required to announce their presence, demand admission, and be refused entry before they were entitled to break doors."); *but see* 3 William Blackstone, Commentaries *288 ("[F]or the most part not so much as a common citation or summons, much less an arrest, can be executed upon a man within his own walls."). Arguably, one who refuses the lawful demand of the King to enter and execute an arrest warrant is in an analogous position to one who is on the run from a lawful

arrest warrant, and so the two could reasonably be expected to have similar expectations of privacy.

Second, the information gathered in cases like Riley's is location data, not call content. To be sure, *Kyllo* and *Karo* set a fairly low threshold level of intrusion within the home at which surveillance becomes a search. But tracking Riley's cell-phone location provided no more information about the interior of Riley's home (or motel room) than did the tracking device in *Karo*, and it provided far less information than did the thermal-imaging device in *Kyllo*. While GPS tracking is "accurate within about 50 feet," *United States v. Carpenter*, 819 F.3d 880, 889 (6th Cir. 2016), and is thus more precise than CSL data, which ballparks a cell phone's location within a "radial wedge extending between one-half mile and two miles in length" based on the cell towers to which it connects, *ibid.*, GPS coordinates reveal nothing other than the location of the phone: no call content, no text-message or email content, and no application data.

Third, the tracking in cases like Riley's is limited in duration and reach. In *Jones*, Justices Sotomayor and Alito wrote separate concurring opinions in which they commented that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment); *id.* at 412 (Sotomayor, J., concurring) (quoting *id.* at 430). Justice Alito's comment, however, pertains to *investigations*, not manhunts. And for fugitives subject to an arrest warrant, the duration of surveillance, which will ordinarily be relatively short-term (i.e., commencing after the issuance of an arrest warrant and ending when the fugitive is found), is less of a concern than for those who are simply suspects of an investigation.

Fourth, although I noted that the third-party doctrine itself does not provide a basis for using technology to detect activity within a home, the fact that cell-phone users *voluntarily* disclose their location data by keeping their phones turned on weighs against finding their location data to be private. It is, of course, unclear whether Riley *knowingly* disclosed his location data (the record does not indicate whether Riley was aware of the cell phone's GPS feature, nor does it include any terms of Riley's cell-phone service contract that would reveal whether Riley agreed to allow AT&T either to gather and store his GPS location data or to initiate signals to Riley's phone to facilitate real-time tracking, if AT&T in fact did that). But the

fact that Riley *chose* to carry a cell phone (as distinguished from the tracking devices carried unwittingly by the defendants in *Karo* and *Knotts*) certainly weighs in favor of allowing the government to access AT&T's records of Riley's cell-phone location in order to arrest him, even if those records were generated only in response to requests from the government for real-time location tracking. A criminal hiding from an arrest warrant "can hardly complain," *Skinner*, 690 F.3d at 774, about the burden of having to evade detection without constant use of a cell phone.

To say otherwise would be to require the government to avert its eyes from GPS location data that are freely available to the wireless providers that facilitate fugitives' use of cell phones, but the Fourth Amendment does not require such willful blindness. *Cf. Ex parte Jackson*, 96 U.S. 727, 737 (1877) (holding that the content of letters and sealed packages deposited in the mail could be examined only upon the issuance of a warrant, but the content of printed matter "left open for examination," such as newspapers, and, by implication, the mailing information on the outside of a sealed letter, was not protected by the Fourth Amendment).

The logic in *Jackson*, in which a defendant was convicted of depositing "a circular concerning a lottery offering prizes" into the United States mail in violation of a federal statute, *id.* at 727–28, is that one using the mail—no matter how essential to daily life the mail might have been in 1877—assumes the risk that the government will see, and will have no duty to avert its eyes from, information left open to be seen. Under the logic of *Jackson*, one who voluntarily but unknowingly left a letter unsealed and then mailed it would have no recourse in the event that a government official found evidence of a crime in the letter and used it to secure a warrant. Perhaps the current state of cell-phone location data is similar: as a general matter, cell-phone users may not have any idea of the extent to which their cell phones are broadcasting their location (whether in the form of CSL data or GPS location data). But in choosing to carry and turn on *and leave on* cell phones equipped with GPS and other location-based services, people arguably assume the risk that their cell-phone service providers may disclose to the government the location data they acquire—at least in the absence of a contractual agreement between the consumer and the service provider that would prohibit or restrict such disclosure. And while the strong Fourth Amendment protections afforded to the home may yet protect *some* cell-phone

location data emitted from within the home from being tracked by the government, a fugitive who carries a cell phone turned on must assume the risk that the government is able to track him wherever he may be.

Of course, law-enforcement officers could track down fugitives the old-fashioned way: they could put out alerts to be posted upon grocery-store bulletin boards for oblivious shoppers to disregard, and they could wait for the fugitives to be caught, perhaps, when they commit some other crime from which they are less successful in flight. But that cannot be what the Constitution requires; when fugitives use sophisticated cell phones to evade detection, whether by communicating electronically, finding hideouts, soliciting willing abettors, or perhaps acquiring false documents and the like, it only makes sense that law-enforcement agents be able to track fugitives' cell-phone location data to execute valid arrest warrants.

Accordingly, even setting aside the fact that the government's GPS location tracking here revealed only information about the public movements of Riley's cell phone, Riley's Fourth Amendment claim fails because Riley was a fugitive from justice who lacked a reasonable expectation of privacy in his whereabouts, and the district court was correct to deny Riley's motion to suppress.

**II**

Unlike the traditional children's game of hide-and-seek, which tolerates most means of finding those who are hiding, the Fourth Amendment separates cop from robber by the requirement that "a neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948), issue a warrant based on probable cause that the robber has committed the robbery.

Once a valid warrant has issued, however, the game changes: the robber may not *both* seek refuge from execution of the warrant *and* simultaneously broadcast his location by carrying a GPS-enabled cell phone.

GPS data, unlike CSL data, can locate a tracked object to within tens of feet of its actual location. Still, as in this case, it may not be sufficiently precise to pinpoint the exact location of a GPS-enabled cell phone. To the extent that GPS tracking reveals location information that

would otherwise be available from public vantage points, such as identifying Riley's presence *at* the Airport Inn in this case, our precedent in *Skinner* permits at least short-term tracking of such location information. Even within the confines of a home or a hotel room, the Fourth Amendment does not shield a fugitive's cell phone from being located while turned on: a cell-phone service provider's records of the phone's location are not private, and their use by law enforcement, compelled or otherwise, is not a search under the Fourth Amendment so long as the officers have at least reasonable suspicion that the phone they are tracking is in the possession of the fugitive they seek.

Finally, I would note that our opinion today does not—because it needs not—address many questions that will almost certainly arise in future geolocation cases, such as whether or when the government may use GPS location data to track individuals other than fugitives within the home. Nor does it address the questions that will surely arise as technology continues to develop. Perhaps, for example, if government agents gain the ability to activate and monitor the microphone, camera, or video recorder on an individual's cell phone without the individual's knowledge, the greater degree of intrusion from such audiovisual monitoring could materially affect even a fugitive's expectation of privacy in the data transmitted from his cell phone. And nothing in our opinion curtails the power of federal and state legislatures to craft legislation against cell-phone location tracking if they wish. Indeed, our opinion today does not address whether *existing* protections under the Stored Communications Act or elsewhere may already impose additional requirements on government agents seeking to engage in the sort of GPS location tracking that the Marshals used here to track Riley, because the only question before us is whether the tracking violated Riley's *constitutional* rights—and it did not.