**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 19a0404n.06**

**No. 17-1910**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| NATASHA FINEOUT; JESSICA WRIGHT; LANCE TYLER, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | **FILED**<br>Aug 02, 2019<br>DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE |
| DEL KOSTANKO; JEFFREY WINARSKI; RYAN KELLOM; RACHEL BAHL; JASON PUNG; BETH LARABEE; MELISSA HARRIS, identified on initiating document as Unknown Party, | ) ) ) ) ) ) | UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| Defendants-Appellees. | ) ) ) | |

BEFORE: COLE, Chief Judge; WHITE and BUSH, Circuit Judges.

PER CURIAM. Plaintiffs appeal the district court's grant of summary judgment to defendants on all claims. For the reasons that follow, we affirm.

## I. Background

This case arises from the police's forcible entry and search of a house located at 1223 South Holmes Street in Lansing, Michigan (the residence), and their arrest and the subsequent prosecution of the plaintiff residents. Officers from the Lansing Police Department arrived at the residence in response to a 9-1-1 call from a neighbor regarding possible child abuse. After being incorrectly informed by dispatch that the residence had been "red tagged" for building code violations, the officers forced entry into the residence and arrested plaintiffs. Plaintiffs advance

claims under state and federal law against the police officers and the 9-1-1 supervisor who provided the erroneous red-tag information.

### A. The Parties

Plaintiffs Lance Tyler, Natasha Fineout, and Jessica Wright lived together at the residence. Tyler was purchasing the property under a land contract; Wright was Tyler's girlfriend; and Fineout is Wright's sister. Tyler's child and Fineout's three children also lived at the property. The youngest was approximately one year old and the oldest was about four years old.

Defendant Melissa Harris is a 9-1-1 dispatch supervisor and, at the relevant time, was responsible for confirming the red-tag status of properties in Lansing in response to police officers' inquiries. The remaining defendants—Del Kostanko, Jeffrey Winarski, Ryan Kellom, Rachel Bahl, Jason Pung, and Beth Larabee (the police defendants)—are officers and sergeants in the Lansing Police Department.

### B. Lansing's "Red-Tag" Procedures

The City of Lansing "red tags" properties that are legally uninhabitable due to code violations. This process includes physically applying a red tag to the property and registering the red-tagged status in a central computer database. The police defendants testified that it was common for people living illegally in red-tagged properties to remove the physical tag, and it was therefore standard procedure to inquire with dispatch whether a property had been red-tagged.

Occupying a red-tagged property constitutes misdemeanor trespassing. *See* Lansing Code of Ordinances § 1460.01(h)-(m). In relevant part, the Lansing Code of Ordinances (the Code) states that any red-tagged building "shall be vacated" and that "[n]o person shall occupy any such structure or allow any domestic animal to occupy any such structure." *Id.* § 1460.01(m). In a section of the Code intended to "promote the public health, safety and welfare of residents of the

City and to provide for the removal and abatement of unhealthy, noxious or dangerous substances, structures and conditions, at private expense," the Code authorizes any "Enforcement Official . . . to inspect occupied or vacant land or premises to ascertain the existence of nuisances on such land or premises."[1] *Id.* §§ 655.01, 655.05. The Code further states that, "[i]f the owner or occupant of the land or premises refuses or denies access for such purpose, the Enforcement Official shall have recourse to every remedy provided by law to secure entry. If the condition that is believed to exist creates an emergency situation in that it imminently endangers human life or health no search warrant shall be required." *Id.*

The code speaks only of the grounds on which an official may access a property for the purposes of inspection; it does not address whether officials have the authority to enter occupied houses that have already been red-tagged, and defendants do not argue that the Code explicitly provides such authority. The record establishes, however, that during the relevant time period, Lansing police commonly entered red-tagged properties without a warrant when they suspected that someone was living inside.

### C. Ingham County Central Dispatch Operation

On June 27, 2012, Ingham County consolidated dispatch operations for all police departments in the county into a county-level Central Dispatch Operation (CDO). The CDO assumed responsibility for responding to police officers' inquiries concerning the red-tag status of Lansing properties. When CDO received such an inquiry, the dispatcher relayed the request to the 9-1-1 supervisor, who checked the Lansing Code Compliance database to determine the status of

---

[1] The Code defines "Enforcement Official" as "the officer or employee of the City or Health Officer charged with the responsibility of enforcing any aspect of these Codified Ordinances with respect to the department, agency or division in which he or she is employed. Enforcement Officials include, but are not limited to, the Mayor, the Director of Public Service, the Director of Parks and Recreation, the Director of Planning and Municipal Development, the Executive Director of Emergency Services, the Director of Building Safety, the Fire Chief and the Chief of Police." Lansing Code of Ordinances § 655.03.

the property. The supervisor then communicated the status of the property to the dispatcher, who provided that information to the requesting officer. Supervisors did not communicate directly with officers requesting red-tag information.

Defendant Melissa Harris was hired in 2007 as a Lansing 9-1-1 Dispatch Operator. Harris remained in that position after dispatch services were consolidated and was subsequently promoted to 9-1-1 Supervisor. At some point after her promotion, Harris received training on how to check a property's red-tag status, but there is no indication in the record as to Harris's knowledge of the circumstances under which officers would request a red-tag status check. Harris testified that the CDO received "at least one" request per day to check the red-tag status of a building. Harris handled her proportional share of the inquiries.

### D. History of the Residence

On July 28, 2011, the Lansing Office of Code Compliance red-tagged the residence, rendering it legally uninhabitable. A notice sent to the owner stated that the residence had broken windows, deteriorated roof covering and foundation waterproofing, damaged roof framing, damaged gypsum board in interior walls and ceilings, and missing paint and protective siding. On August 9, 2011, a new owner purchased the property by land contract and made various repairs. The Office of Code Compliance removed the red-tag status after another inspection on November 3, 2011. Tyler entered into a land contract for the residence on May 3, 2013.

### E. Events of June 20, 2013

On June 20, 2013, the CDO received a 9-1-1 call from a neighbor of the residence. The caller stated that she had heard the occupants of the residence "scream[ing] profanities and . . . hitting their children." (R. 83-1, PID 521.) The caller further stated that she had heard the

noises for the "last hour and a half that I've been home" and noted that her "neighbors keep telling me this has been . . . an ongoing thing all day." (*Id.*)

Bahl was the first officer to arrive at the residence; Kellom, Winarski, Larabee, Pung, and Kostanko all arrived shortly after. When Bahl arrived, she observed that the exterior of the residence was in disrepair and asked dispatch whether it had been red-tagged. Sergeant Kostanko corroborated Bahl's observations of the residence, but admitted that the officers did not observe any conditions that would render the residence uninhabitable. Kostanko also admitted that the officers did not "witness[] any child abuse" at the residence and did not hear any of the loud noises described in the 9-1-1 call. (R. 83-2, PID 670.)

The 9-1-1 dispatcher relayed Bahl's red-tag inquiry to Harris, who informed the dispatcher that the residence was red-tagged. The dispatcher relayed this information to Bahl. Bahl asked the dispatcher "to double-check that, please, because it's occupied right now." (*Id.* at PID 652.) The dispatcher responded "10-4, the Center supervisor just advised that it is red-tagged. That house is red-tagged." (*Id.*) It does not appear that the dispatcher asked Harris to check a second time. The property was not red-tagged as of June 20, 2013. Harris could provide no explanation and the record is silent regarding the cause of her erroneous answer.[2]

Bahl testified that she also requested a check on the license plates of two cars present at the residence, which revealed that the cars belonged to plaintiffs Wright and Fineout and that Fineout was the subject of an outstanding arrest warrant for unpaid child support. Bahl also testified that "one of the vehicles [came] back registered to" the residence, but she was unsure

---

[2] Lansing's Lead Housing Inspector submitted an affidavit stating that due to a replacement of the Code Compliance Department's software in 2015, there is "no way to currently duplicate or recreate the same 'screen shot' that was viewed by the Ingham County 9-1-1 Supervisor on June 20, 2013 for an inquiry as to the property located at 1223 S. Holmes Street." (R. 83-2, PID 676.) The record further establishes that "there exists no paper record or document . . . of the image as viewed on 6/20/2013 by the Ingham County 9-1-1 Supervisor." (*Id.*) However, pursuant to a FOIA request, Ingham County Central Dispatch provided a page from its software access portal dated July 28, 2013, reflecting that the red-tag status had been cleared as of November 3, 2011.

whether it was Fineout's vehicle. (*Id.* at PID 661.) Although Bahl testified that she was "fairly certain" that she requested the check over the radio—rather than via her in-car computer—the radio transcript does not reflect any such request, and it is therefore unclear exactly when the officers learned of the existence of the arrest warrant. (*Id.* at 650–59, 661.) However, Bahl testified that she was aware of the warrant before entering the house. Kostanko testified that he did not remember whether he learned about the arrest warrant before or after entering the residence. No defendant claims that the officers entered the residence because of the warrant, or that they informed the occupants of the warrant.

After all the police defendants arrived, the officers requested permission to enter the residence, stating that they were "there to check the welfare of the children and needed to see them"; but Wright and Fineout refused to open the door and demanded that the officers get a warrant. (*See* R. 83-1, PID 537–38.) Defendant Winarski responded that the police did not need a warrant for entry into a red-tagged house and informed Wright and Fineout that if they continued to refuse entry, the officers "would be ramming open a door to make entry and that they would go to jail." (*Id.* at PID 535.) Wright responded that the house was not red-tagged and the officers needed a warrant to enter. After repeated warnings to move any children away from the door, the officers used a battering ram to break down the back door.

Wright and Fineout were arrested and charged with trespassing on a red-tagged property and hindering, opposing, obstructing, and resisting police activity, both misdemeanors under the Lansing Code. Fineout was also arrested pursuant to the active warrant.

While in the residence, the officers discovered 21 marijuana plants located in the locked basement. Plaintiff Tyler—who had been absent from the residence until this point—returned as the officers were preparing to leave. Tyler informed the officers that the plants belonged to him

and that he had the proper documentation under Michigan's medical marijuana laws. According to defendants, Tyler could not produce the documentation, and on October 17, 2013, he was charged with Delivery of a Controlled Substance and Manufacturing Marijuana.[3]

Tyler ultimately provided the required documentation for the marijuana plants, and all charges against him were dismissed. Fineout pleaded guilty to trespassing on a red-tagged property and the city dismissed the hindering charge. However, the trespassing charge was later dismissed. The city dismissed the trespassing charge against Wright when it became clear that the residence was not red-tagged, and later dismissed the hindering charge.

### F. Procedural History

Plaintiffs filed the instant suit, naming Harris, Kostanko, Winarski, Kellom, Bahl, Pung, and Larabee as defendants.[4] All three plaintiffs brought claims under § 1983 for unlawful search, false arrest, and malicious prosecution, as well as a claim for false arrest under Michigan law. Fineout consented to dismissal of her false-arrest claims in light of the outstanding warrant for her arrest.

Although plaintiffs purported to advance a § 1983 claim against the City of Lansing, including allegations against the City in their complaint, they failed to name the city as a defendant or serve process on it. The district court found that Lansing was not a party to the action, and plaintiffs do not challenge that ruling on appeal.

Defendant Harris and the police defendants moved separately for summary judgment, all arguing that they were entitled to qualified immunity on plaintiffs' § 1983 claims and

---

[3] In their appellate brief, plaintiffs point to an affidavit from Tyler stating that he had documentation for his medical marijuana license posted on his basement door. However, plaintiffs never called this affidavit to the district court's attention as a basis for creating a genuine issue of material fact.

[4] In their initial complaint, plaintiffs named Harris as "Unknown 911 Center Supervisor" and also named the police dispatcher as a defendant. Plaintiffs subsequently dismissed the dispatcher, and amended the caption to name Harris.

governmental immunity on the state-law claims. Plaintiffs opposed defendants' motions for summary judgment and filed a cross-motion, arguing that they were entitled to summary judgment against the police defendants on the merits. The district court granted defendants' motions and denied plaintiffs' cross-motion, finding that defendants were entitled to qualified immunity with respect to the § 1983 claims and to governmental immunity with respect to the state-law claims. The district court further found that, even if defendants were not entitled to governmental immunity on the state-law false-arrest claims, those claims "fail as a matter of law because there was probable cause" for the arrests. (R. 117, PID 1194.)

This appeal followed.

## II.     Applicable Law

### A.  Standard of Review

We have jurisdiction over an appeal from a district court's decision granting summary judgment. *See* 28 U.S.C. § 1291. We review de novo a grant of summary judgment, including a decision based on qualified immunity. *Santiago v. Ringle*, 734 F.3d 585, 589 (6th Cir. 2013) (citations omitted). Summary judgment is proper where the movant shows "that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmovant must rebut such a showing by presenting evidence on which the jury could reasonably find in its favor; "'a mere scintilla of evidence is insufficient' to meet this burden." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (alterations omitted) (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000)). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *McLean*, 224 F.3d at 800).

**B. 42 U.S.C. § 1983 and Qualified Immunity**

To state a claim under § 1983, the "plaintiff must set forth facts that, when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

Under the doctrine of qualified immunity, government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "is an immunity from suit rather than a mere defense to liability," and government officials protected by the doctrine are "entitle[d] not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted).

Courts determining whether an official is entitled to qualified immunity ask two questions: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have "discretion to decide which of these two questions to address first, considering the circumstances of the particular case." *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Under the doctrine of qualified immunity, government officials "will be liable for the violation of a constitutional right only if the right was 'clearly established in light of the specific context of the case.'" *Id.* (alteration omitted) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th

Cir. 2010)). A right is clearly established when the "contours of the right" as defined by existing case law are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009) ("The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional.").

The doctrine of qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)). Qualified immunity "applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quoting *Pearson*, 555 U.S. at 231). Plaintiffs bear the burden of showing that defendants are not entitled to qualified immunity. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

### III. Discussion

#### A. Unlawful Search

To sustain their "unlawful search" claim, plaintiffs must demonstrate that the officers' entry was not reasonable. Although police are generally required to "obtain a warrant based upon a judicial determination of probable cause prior to entering a home[,] . . . there are a few well-defined and carefully circumscribed circumstances in which a warrant will not be required." *Thacker v. City of Columbus*, 328 F.3d 244, 252–53 (6th Cir. 2003) (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). One of those exceptions is the existence of "exigent circumstances"— "situations where real immediate and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." *Id.* at 253 (internal quotation marks omitted) (quoting

*Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). One such exigent circumstance is a "risk of danger to the police or others." *Id.* "Thus, law enforcement officers 'may enter a home . . . to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010) ("Preventing imminent or ongoing physical abuse within a home qualifies as an exigent circumstance[.]").

The Supreme Court has also recognized that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see also United States v. Riley*, 858 F.3d 1012, 1020 (6th Cir. 2017) (Boggs, J., concurring) ("[I]n the case of a fugitive subject to a valid arrest warrant, the arrest warrant 'will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen.'" (quoting *Payton*, 445 U.S. at 602)). Although *Payton* concerned a felony arrest warrant, we have held "the rule of *Payton* applies to [a] misdemeanor arrest warrant" and authorizes the entry and search of a house to effect an arrest warrant where the police have reason to believe that the subject of the warrant is inside.[5] *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 689 (6th Cir. 2006); *see also United States v. Clayton*, 210 F.3d 841, 843–44 (8th Cir. 2000); *United States v. Spencer*, 684 F.2d 220, 222–24 (2d Cir. 1982).

1.  Claims Against the Police Defendants

Recognizing that police entered plaintiffs' residence without a search warrant and the house was not, in fact, red-tagged, we conclude this case is best decided on the second qualified-immunity question—whether it would have been apparent to a reasonable police officer that his or

---

[5] The warrant for Fineout's arrest is not in the record, but plaintiffs concede that a valid "child support warrant" existed for her arrest. (R. 92, PID 932.)

her conduct violated plaintiffs' clearly established constitutional rights. We conclude that a reasonable officer in defendants' position would have believed entry into the residence was lawful based on all of the circumstances in this case, including the 9-1-1 call reporting child abuse, the outstanding arrest warrant for Fineout, and the dispatcher's confirmation that the residence was red-tagged.

Police officers have the "right to rely on dispatch information" and courts therefore consider an officer's reasonable reliance on such information when determining whether the officer is protected by qualified immunity. *Dorsey v. Barber*, 517 F.3d 389, 396 (6th Cir. 2008); *see also Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003) (finding that officers were protected by qualified immunity where "[i]f the dispatcher's information were accurate and reliable, as the police presumed, the totality of circumstances would justify" the officers' actions). Here, dispatch twice informed the police defendants that the residence had been red-tagged, and the officers had no reason to doubt this information.[6] It was therefore reasonable for them to believe that the residence was, in fact, red-tagged.

Citing multiple cases supporting the warrant requirement,[7] plaintiffs contend that even with the red-tag information, defendants lacked authority to forcibly enter the residence without a warrant. But the record establishes that it was a common practice for Lansing police officers to enter red-tagged properties, without a warrant, where there was reason to believe that someone was illegally occupying the structure. Officers testified that it was part of their training to do so. Indeed, plaintiffs argued below that the officers entered the residence pursuant to a policy and

---

[6] Contrary to plaintiffs' argument, Wright's and Fineout's on-the-scene denials that the residence was red-tagged did not require that police do more than what they did, i.e., ask for verification.

[7] *Welsh v. Wisconsin*, 466 U.S. 740 (1984); *Payton*, 445 U.S. 573; *Smith v. Stoneburner*, 716 F.3d 926 (6th Cir. 2013).

custom of the City of Lansing. We note that Lansing's practice of conducting warrantless entries into occupied, red-tagged homes is troubling. However, in this case, plaintiffs have identified no case supporting that it was clearly established that police cannot lawfully enter an illegally occupied structure without a warrant.

And the officers encountered additional circumstances on June 20, 2013, that lead us to conclude that it was not clearly established that entry into the residence violated plaintiffs' constitutional rights. Significantly, a neighbor called 9-1-1 and reported that adults in the home were "scream[ing] profanities and . . . hitting their children." (R. 83-1, PID 521.) The caller noted that a "little girl . . between the ages of 1 and 2" lived in the house. (*Id.*) When the officers arrived, they could not see the children to confirm that they were safe—plaintiffs told officers, "[y]ou can't look at the kids. You can't check the kids[.]" (R. 92-7, PID 1019). Additionally, Bahl discovered that there was an active warrant for Fineout's arrest before the officers entered the residence. The combination of these circumstances convince us that the defendants did not violate any clearly established right by entering the residence. *See Schreiber*, 596 F.3d at 330–31 (holding that exigent circumstances justified warrantless entry into home after officers received an anonymous report of suspected abuse, heard shouting inside the home, and were treated in a "hostile and uncooperative" manner by the homeowner); *Shreve*, 453 F.3d at 689 (holding that "the deputies acted lawfully when they broke into [plaintiff's] house and searched it to arrest her, notwithstanding the fact that the arrest was for a misdemeanor.").[8]

---

[8] Plaintiffs' arguments that the officers did not think this was an emergency circumstance or rely on the arrest warrant are without merit. Reasonableness is an objective inquiry—we look to whether an action "is objectively justified, rather than to the motive of the . . . officer." *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *see also Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment."); *United States v. Sease*, 659 F.3d 519, 524–25 (6th Cir. 2011) ("Simply, the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." (quotations and alterations omitted)).

2.   Claims Against Harris

Plaintiffs argue that the district court erred by finding that Harris is entitled to qualified immunity.  Plaintiffs contend that Harris is not entitled to qualified immunity because that doctrine does not protect a government official who "provides information to support probable cause that is knowingly or deliberately false or with a reckless disregard for the truth."  (Appellants' Br. at 47 (emphasis omitted) (citing *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (asking whether official "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and whether "such statements or omissions [we]re material, or necessary, to the finding of probable cause")).)  Plaintiffs first argue that Harris failed to assure that she was sufficiently trained to do her job.  (Appellants' Br. at 48 ("Plaintiffs assert that proceeding to engage in searching for, interpreting, and relaying critical information without sufficient training and knowledge in how to do it is a 'reckless disregard' of the consequences.").)  Even if this allegation was sufficient to create liability, this contention is not supported by mere evidence of a mistake.

Plaintiffs also argue that a genuine issue of material fact remains regarding whether Harris's computer search revealed that the property was no longer red-tagged. (Appellants' Br. at 50 ("In this case, there is a factual issue as to whether Defendant Harris did or did not see an entry other than "complied" on June 20, 2013.").)  Although there is no direct evidence of the precise information Harris viewed on her computer on June 20, 2013, it is undisputed that the residence was not red-tagged as of that date, and there is no evidence that a computer error caused the system to display erroneous information.  But even assuming that Harris made a mistake that amounted to reckless disregard, plaintiffs cannot show that Harris's statements were necessary to the officers' finding of probable cause.  *Sykes*, 625 F.3d at 305.  As discussed above, the officers were able to

enter the home in light of the exigent circumstances and outstanding arrest warrant, notwithstanding whether the house was red-tagged. Thus, we conclude Harris is entitled to qualified immunity on this claim as well.

### B. False Arrest

Wright and Tyler advance false-arrest claims against all defendants. To sustain a claim for false arrest under § 1983, plaintiffs must prove that the arresting officer lacked probable cause to arrest them. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Probable cause exists where there is "a 'fair probability' that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citing *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001)).

"An officer possesses probable cause when, at the moment the officer seeks the arrest, 'the facts and circumstances within the officer's knowledge and of which she had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (internal alterations omitted) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). If probable cause exists to arrest the suspect for any of the charged offenses, then the false arrest claim must fail. *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005) ("In this instance, the City of Xenia charged Lyons with violating three of its ordinances[.] To the extent probable cause exists for any one of these charges, the arrest was lawful and our analysis is complete.").

#### 1. Claims Against the Police Defendants

As discussed earlier, the police were entitled to rely on the information provided by the dispatch operator for purposes of qualified immunity. That information, if true, provided probable cause to believe that Wright and Fineout had committed the crime of occupying a red-tagged

building illegally. *See id.* Contrary to plaintiffs' argument, the officer defendants were not obliged to investigate further simply because no red-tag was visible. But more importantly, probable cause existed to arrest Wright for the other charged offenses: both Wright and Fineout had failed to comply with police requests to view the children and to permit entry despite the exigent circumstances that existed, which created probable cause for the offense of hindering, opposing, obstructing, and resisting police activity.

Tyler additionally complains that his later arrest was based solely on the evidence of his basement grow operation, which was "obtained as a direct result of the unlawful entry and search." (Appellants' Br. at 34.) Tyler then asserts, without further explanation, that there was no basis for his state charges, and argues that the police defendants had no authority to enforce federal law. While Tyler might have had an argument in favor of suppression had the prosecution continued, he has not shown that the arresting officer lacked probable cause to arrest him for possession of 21 marijuana plants. Tyler admitted that the plants were his, but contended that his possession of the plants was legal under Michigan's medical marijuana laws. Michigan requires medical marijuana patients or caregivers to possess and display certain documentation, *see* Mich. Comp. Laws § 333.26424, and Tyler was unable to provide that documentation. Absent the documentation, the police defendants had probable cause to arrest Tyler.

2. Claim Against Harris

Analysis of the false-arrest claim against Harris turns on the same considerations discussed above; because there was an alternative basis to arrest Wright and Tyler—the hindering, opposing, obstructing, and resisting police activity for Wright; and delivery of a controlled substance and manufacturing marijuana for Tyler—Harris is entitled to qualified immunity on the false arrest claim.

### C. Malicious Prosecution

All three plaintiffs advance claims for malicious prosecution against the police defendants, but not against Harris.

To sustain a § 1983 claim for malicious prosecution, "a plaintiff must prove the following: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). "In order to prove malicious prosecution under federal law, a plaintiff must show, at a minimum, that there is no probable cause to justify an arrest or a prosecution." *Marcilis v. Township of Redford*, 693 F.3d 589, 604 (6th Cir. 2012) (quoting *Voyticky*, 412 F.3d at 675). "[P]robable cause to initiate a criminal prosecution exists where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb*, 789 F.3d at 660 (internal quotations and alterations omitted).

Plaintiffs offer similar arguments in support of their malicious prosecution claim. Because the officers had a reasonable belief based on the information provided that there was probable cause to arrest and charge plaintiffs, they are entitled to qualified immunity. As to any continued prosecution, we note that plaintiffs have not shown that the police defendants had the requisite role in the decision to prosecute where the record includes letters from the prosecutor to defense counsel. Further, regarding the marijuana charges, Tyler has not shown either the absence of probable cause or that defendants made the decision to prosecute.

### D. State Law Claims

Wright and Tyler also assert state-law claims for false arrest against all defendants.[9]  Under Michigan law, "to prevail on a claim of false arrest . . . , a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause."  *Hoover v. Walsh*, 682 F.3d 481, 501 (6th Cir. 2012) (internal alteration omitted) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003)).  "If the arrest was legal, there has not been a false arrest . . . ."  *Peterson Novelties*, 672 N.W.2d at 362.

The Michigan Supreme Court has established a test for the applicability of governmental immunity to intentional torts such as false arrest.  *See Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (Mich. 1984).  A defendant claiming governmental immunity must establish "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature."  *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008) (citing *Ross*, 363 N.W.2d at 647); *see also Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).

The "good faith" prong of this test is a subjective inquiry that "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent."  *Odom*, 760 N.W.2d at 229.  Under Michigan law, good faith is defined "simply as acting without malice."  *Id.* at 225.  The employee asserting governmental immunity bears the burden of proof.  *Id.* at 227–28.

---

[9] In the text of a heading in their opening brief, plaintiffs appear to suggest that they have also raised a state-law malicious prosecution claim.  (*See* Appellants' Br. at 44 ("State law claims for false arrest, malicious prosecution, and immunity.").)  Plaintiffs did not articulate any such claim in their complaint and advanced no arguments concerning such a claim below.  Further, the body of plaintiffs' brief contains no mention of a state-law malicious prosecution claim.  We therefore treat this stray reference as an error and proceed to address the state-law claim for false arrest.

Discretionary acts are those that "require personal deliberation, decision, and judgment"; ministerial acts "constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice." *Id.* at 226 (quoting *Ross*, 363 N.W.2d at 668). Although the decision underlying a discretionary act "need not be extraordinary, governmental immunity is not afforded for every trivial decision an actor may make." *Id.* (internal quotation marks omitted).

It is undisputed that the police defendants undertook the challenged actions during the course of their employment and that they reasonably believed they were acting within the scope of their employment. The record also establishes that the police defendants undertook their duties in good faith and without malice. Finally, the police defendants' behavior was discretionary because responding to calls "require[s] personal deliberation, decision, and judgment." *See Odom*, 760 N.W.2d at 226 (quoting *Ross*, 363 N.W.2d at 668). The police defendants are therefore entitled to governmental immunity.

Harris's conduct, however, consisted of looking up the red-tag status of the premises and informing the requesting officers of that status. Harris's conduct thus constituted "the performance of a duty in which the individual has little or no choice" and is the sort of "trivial decision" that is not protected by governmental immunity. *Id.* (quoting *Ross*, 363 N.W.2d at 668). Harris is therefore not protected by government immunity.

Harris is nevertheless entitled to summary judgment on this claim because she did not sufficiently participate in illegal or unjustified arrests. *See Walsh v. Taylor*, 689 N.W.2d 506, 513 (Mich. Ct. App. 2004) (for claim of false arrest, "plaintiff had to show that [the defendant] participated in an illegal and unjustified arrest").

## IV.    Conclusion

For the reasons set out above, we AFFIRM.

No. 17-1910, *Fineout, et al. v. Kostanko, et al.*

**HELENE N. WHITE, Circuit Judge, concurring in part and in the judgment**. I agree with my colleagues to affirm the district court and with their analysis of the malicious-prosecution and state-law claims. However, I would apply a different analysis to the other qualified-immunity questions raised in this case. Accordingly, I join parts I., II., III.C., and III.D. of the majority opinion.

I do not agree that the police defendants had probable cause to enter the residence without a search warrant given that the house was not, in fact, red-tagged. *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985) (explaining that when "police make a *Terry* stop in objective reliance on a flyer or bulletin, . . . the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop" (citation omitted)). Because Harris advised that the house was red-tagged without any information supporting that assertion, the police defendants did not have probable cause to enter the house. Nor do I agree that the police defendants established exigent circumstances. Nonetheless, the police defendants are still entitled to qualified immunity for the § 1983 unlawful-search and false-arrest claims because they relied on the dispatch information without any indication that the information was false, and followed their common practice of entering red-tagged properties without a warrant.[1]

Harris, however, is not entitled to rely on erroneous information that she herself provided. The question then is whether Harris falls outside the protections of qualified immunity either because she was "plainly incompetent" or because she "knowingly violate[d] the law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)). Although Harris's conduct can reasonably be viewed as plainly incompetent, *see*

---

[1] Like the majority, I find Lansing's practice of conducting warrantless entries into occupied, red-tagged homes to be troubling. However, we need not determine the constitutionality of that practice in this case.

*Dawkins v. Graham*, 50 F.3d 532, 533-35 (8th Cir. 1995); *Bibart v. Stachowiak*, 888 F. Supp. 864, 865–66 (N.D. Ill. 1995), I agree with the district court that Harris cannot be charged with knowledge that her failure to correctly report that the residence was not then the subject of a red-tag would cause the officers to violate plaintiffs' constitutional rights. As the district court noted, "Harris had no identifying information about Plaintiffs other than the street information, no information about whether, or why the police were at the house, and no knowledge that police were intending to conduct a warrantless search and subsequently arrest Plaintiffs," and therefore she "could not have known that mistakenly telling police a property was red-tagged would lead to a warrantless search." (R. 117, PID 1185.) Although Harris may reasonably be charged with knowledge that the officers would enter the structure if they were informed that it was red-tagged, she had no reason to know that the house was occupied and was never informed of plaintiffs' presence. In light of Harris's lack of knowledge of the relevant circumstances and the attenuation between her actions and the alleged deprivation of plaintiffs' rights, plaintiffs' § 1983 claims against Harris for unlawful search and false arrest fail. *See Fettes v. Hendershot*, 375 F. App'x 528, 532 (6th Cir. 2010).