The court delivered a PER CURIAM opinion. BOGGS, J. (pp. 1018-24), delivered a separate concurring opinion.
OPINION
PER CURIAM.
This case calls upon us to clarify the rules by which police may seek to find miscreants: When a fugitive subject to an arrest warrant for armed robbery hides in a motel, may the government track his cell phone’s GPS coordinates to locate and arrest him?
Yes, the district court held—and we affirm, holding that the government’s detection of Montai Riley’s whereabouts in this case, which included tracking Riley’s real-time GPS location data for approximately seven hours preceding his arrest, did not amount to a Fourth Amendment search under our precedent in United States v. Skinner, 690 F.3d 772, 781 (6th Cir. 2012). The government used Riley’s GPS location data to learn that Riley was hiding out at the Airport Inn in Memphis, Tennessee— but only after inquiring of the front-desk clerk did the government ascertain Riley’s specific room number in order to arrest him. The GPS tracking thus provided no greater insight into Riley’s whereabouts than what Riley exposed to public view as he traveled “along public thoroughfares,” id. at 774, to the hotel lobby. Therefore, under Skinner, Riley has no reasonable expectation of privacy against such tracking, and the district court properly denied Riley’s motion to suppress evidence found upon Riley’s arrest.
I
On June 23, 2015, a state court in Kent County, Michigan, issued an arrest warrant for Riley, having found probable cause to believe that he had committed armed robbery of a local Check ’n Go store on June 22. Riley had allegedly entered the store, pointed a gun at the clerk, instructed her to open the safe, and fled on *1014 foot with a “money box and money bags.” On June 25, Riley purchased a cell phone serviced by AT&T. A member of Riley’s family gave this phone’s telephone number to Riley’s girlfriend “so she could contact him while he was ‘on the run.’ ” Riley’s girlfriend in turn disclosed the number to Special Deputy Joel Bowman, a member of the United States Marshal Service Grand Rapids Apprehension Team. On June 26, Bowman applied for and received an order from the 17th Circuit Court of Kent County, Michigan, compelling AT&T to produce telecommunications records of Riley’s cell phone under federal electronic-surveillance laws. See 18 U.S.C. §§ .2703, 3123, 3124.
The court order compelled disclosure of call metadata such as inbound and outbound phone numbers and cell-site location (CSL) data, as well as real-time tracking[1] or “pinging” of the latitude and longitude coordinates of Riley’s phone. Specifically, the order required AT&T to disclose the following, potentially for two months, until August 26, 2015;
16. Precision location of mobile device (GPS Location) such that service provider shall initiate a signal to determine the location of the subject’s mobile device on the service provider’s network or with such other reference points as may be reasonable [sic] available and a [sic] such intervals and times as directed by State Task Force Investigators and Deputy Marshals of the United States Marshal Service.
Within hours of the issuance of the surveillance order, U.S. Marshals received real-time GPS data revealing that Riley’s phone was located at the Airport Inn in Memphis.[2] Task-force deputies in the Mar *1015 shals’ Memphis office went to the motel, showed the front-desk clerk a picture of Riley, and determined that Riley had checked in under the name “Rico Shawn Lavender” and was in Room 314. The deputies went to Riley’s room and knocked. Riley opened the door and immediately attempted to shut it, but the deputies entered the room and arrested Riley at some time between 8:50 and 9:00 p.m. A Smith & Wesson .22-caliber pistol was in plain view on the bed, and Riley was subsequently indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).
II
Following his arrest in Memphis, Riley was extradited to Wyoming, Michigan, where, on October 6, 2015, he was sentenced in state court to 7.5 to 25 years of imprisonment for armed robbery, with an earliest release date of January 13, 2023, and a latest discharge date of July 13, 2040. He then returned to the United States District Court for the Western District of Tennessee to answer his federal firearm-possession charge. Riley twice moved to compel the government to disclose information on how the government located Riley so quickly, asserting that “[t]here was no known legal way that Mr. Riley’s location could have been located absent the use of illegal cell tracking technology,” and that disclosure was required to allow Riley to bring a constitutional challenge to whatever technology was used. The district court granted Riley’s second motion to compel.
Attaching copies of the state court’s surveillance order, Riley moved to suppress the pistol found in his motel room as the fruit of an unconstitutional search, arguing that whatever method the government had used to find him—whether by GPS pinging, a “cell-site simulator” such as a “Dirt-Box, Stingray, etc.,” or otherwise, Mot. to Suppress, R. 35 at 3—intruded upon Riley’s reasonable expectation of privacy and thus required a search warrant.[3] The gov- *1016 eminent opposed the motion, including with its response a fourteen-page exhibit listing the GPS coordinates of Riley’s cell phone on 454 occasions starting June 26, 2015, and ending June 30, 2015. The first twenty-two entries are listed above. Ante, at n.2. On average, AT&T logged approximately one “ping” every thirteen minutes, although, of course, Riley was arrested on the first day of the tracking.
*1015 [[Image here]]
*1016 The district court denied the motion on two alternative bases: first, on the ground that our decision in Skinner justified short-term GPS tracking without a warrant; second, on the ground that the warrant that had been issued for Riley’s arrest justified obtaining real-time GPS information about Riley’s location in order to effectuate his arrest. Riley pleaded guilty to being a felon in possession of a firearm, reserving his right to appeal the denial of his motion to suppress, and was sentenced to forty-one months of imprisonment to run concurrently with his state sentence but with a delayed start date of February 13, 2022.
The sole question before us is whether the district court erred in holding that the government did not violate Riley’s Fourth Amendment rights by compelling AT&T to disclose, and then by subsequently using, the real-time GPS location of Riley’s cell phone over the course of approximately seven hours.[4] Because the sort of short-term tracking conducted here falls squarely within the logic of our precedent in Skinner, we affirm.
Ill
The Fourth Amendment protects individuals against unreasonable searches and seizures of their “persons, houses, papers, and effects.” Law-enforcement officers conduct a “search” when they seek to obtain information in either of two ways: (1) by physically trespassing upon an individual’s person, house, papers, or effects, see United States v. Jones, 565 U.S. 400, 406-07, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (holding GPS tracking of a vehicle for twenty-eight days was a search when agents physically trespassed upon the vehicle to install the tracking device), or (2) by intruding upon an individual’s reasonable expectation of privacy, see Katz v. United States, 389 U.S. 347, 360-62, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (holding eavesdropping on a payphone conversation by means of an electronic listening and recording device, when the payphone door was closed, was a search; noting “reasonable expectations of privacy may be defeated by electronic as well as physical invasion”). Riley does not argue that the government committed a physical trespass of any sort, and we decline to consider whether pinging a cell phone may constitute an electronic trespass,[5] so only the ‘reasonable expectation of privacy’ test is applicable here.
*1017 Both the Supreme Court and our court have declined to recognize as reasonable a criminal suspect’s expectation of privacy in his location while moving along public thoroughfares. See United States v. Knotts, 460 U.S. 276, 279-80, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (holding the placement of a radio transmitter by narcotics officers in a container of chemicals to be purchased by a suspected methamphetamine manufacturer was not a search when officers used the transmitter to track a vehicle while it carried the transmitter along public roads to a cabin, but when the transmitter did not enter the cabin itself); United States v. Skinner, 690 F.3d 772, 774-75, 776 (6th Cir. 2012) (holding government use of real-time cell-phone GPS data to track a suspected drug trafficker as he traveled for three days in a “motorhome that was driven on public roads” was not a search).
In Skinner, we held that location data emitted by a “voluntarily procured” cell phone could not be subject to a reasonable expectation of privacy, even if the cellphone user had no reason to expect that the government would compel the service provider to disclose those data. Id. at 779. There, because “the defendant’s movements could have been observed by any member of the public,” ibid., we held that it could not possibly be a Fourth Amendment violation for law-enforcement officers to monitor those movements by using cellphone location data just because such electronic monitoring was more efficient than relying on visual surveillance alone.
The fact that the defendant’s movements in Skinner were visible from public vantage points was an important factor in our reasonable-expectation-of-privacy analysis. Entering an individual’s home to observe his movements, even if by technological device rather than physically, would much more likely raise Fourth Amendment concerns in light of the common law’s protection of the home against government intrusion. As William Pitt, Earl of Chatham, reportedly proclaimed during a debate in Parliament in 1763: “The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!” The Oxford Dictionary of Quotations (2d ed. 1953), 379, quoted in Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). The two-and-a-half intervening centuries have seen little jurisprudential erosion of this tenacious reverence for the sanctity of the home.
The Supreme Court has made very clear, for example, that “obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical ‘intrusion into a constitutionally protected area’ constitutes a search.” Kyllo v. United States, 533 U.S. 27, 35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (emphasis added) (citation omitted) (quoting Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)) (holding government use of thermal-imaging devices to monitor the heat being produced inside a home as part of a strategy to detect indoor marijuana growing was a search where the devices were unavailable to the general public, even though the devices were used only from outside the home without effecting a physical trespass); United States v. Karo, 468 U.S. 705, 708-09, 713-15, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (holding government monitoring of a tracking device placed in a *1018 shipment of chemicals taken home by a suspected drug dealer was a search where the agents tracked the device to locate the chemicals, on several occasions, within the defendant’s house and various other private residences; distinguishing Karo from Knotts on the sole basis that unlike in Knotts, in which “the record did not show that the beeper was monitored while the can containing it was inside the cabin,” the government in Karo had “surreptitiously employed] an electronic device to obtain information” about the interior of “a private residence, a location not open to visual surveillance,” in a way that was not feasible without the aid of the device) (emphasis added).
Searches “inside a home without a warrant are presumptively unreasonable.” Karo, 468 U.S. at 715, 104 S.Ct. 3296; see also Silverman, 365 U.S. at 511, 81 S.Ct. 679 (holding that the right to privacy at home is “[a]t the very core” of what the Fourth Amendment seeks to protect). And the Fourth Amendment’s full complement of protections “also applies to hotel rooms.” United States v. Allen, 106 F.3d 695, 698 (6th Cir. 1997) (citing Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408,17 L.Ed.2d 374 (1966)).
But using seven hours of GPS location data to determine an individual’s location (or a cell phone’s location), so long as the tracking does not reveal movements within the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search. After all, the tracking in Knotts revealed the location of the cabin to which the criminal suspects had traveled—but the tracking in Knotts was not a search because it revealed no information about the interior of the cabin itself. Likewise here, the tracking revealed only that Riley had traveled to the Airport Inn, not which room (if any) the phone was in at the time of the tracking. And the tracking in Karo, while a search to the extent that the tracking device there was monitored within private residences, was not a search at other times, such as when the tracking device was monitored in one of the defendant’s vehicles “on its trip ... to the immediate vicinity of’ a private residence. 468 U.S. at 719, 104 S.Ct. 3296 (emphasis added).
Therefore, the government did not conduct a search under the Fourth Amendment when it tracked the real-time GPS coordinates of Riley’s cell phone on the date of Riley’s arrest. Skinner upheld tracking that spanned three days; here, approximately seven hours elapsed between the first ping and the time of Riley’s arrest. That Riley was arrested in a motel is of no moment, for the government learned no more about Riley’s whereabouts from tracking his cell-phone GPS data than what Riley exposed to public view by traveling to the motel lobby “along public thoroughfares,” Skinner, 690 F.3d at 774—even if Riley meant to keep his location a secret, one cannot expect privacy in one’s public movements. And had Riley truly wished to avoid detection, he could have chosen not to carry a cell phone at all, or to turn it off. The district court thus correctly denied Riley’s motion to suppress.
AFFIRMED.

. Cell-phone location tracking refers to all methods of tracking a cell phone, including gathering cell-site location information (commonly referred to as CSL or CSLI) and tracking satellite-based Global Positioning System (GPS) data. CSL data are generated when a cell phone connects with a cell tower in order to make or receive a call; a phone may connect to and disconnect from multiple towers during the course of a phone call if, for example, the caller is in motion during the call. GPS data, on the other hand, do not come from a cell tower. Rather, GPS data reveal the latitude and longitude coordinates of the cell phone, regardless of whether a call is in progress, as identified by satellites orbiting the Earth that connect to the phone. A cell phone’s GPS location can be identified so long as the phone has GPS functionality installed (as smartphones almost universally do), the phone is turned on, and .the GPS functionality is not disabled. Finally, “pinging” is a word that may refer in some contexts to a cell phone’s connecting to a cell tower (e.g., "the phone pinged the tower”), and in other contexts to a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own (e.g., “AT&T pinged the phone”).
in line with the practice of other courts that have discussed cell-phone tracking, we use "pinging” only in the latter sense: to ping a cell phone is to send a signal, so to speak, to identify where the phone is at any given moment. While pinging may in some cases employ CSL information (for example, by triangulating the location of a phone while a call is in progress by using data gathered from multiple cell towers), the pinging at issue in this case, as in most recent cases, involves only real-time collection of GPS data.

. AT& T provided the cell phone's GPS coordinates at various times, the first twenty-two of which are detailed below. No evidence of record indicates whether Riley’s phone automatically transmitted its GPS coordinates to AT&T (and if so, whether on a continuous basis or otherwise) or whether AT& T affirmatively sent a signal to Riley’s phone to cause it to send AT&T its GPS coordinates. When viewed on a map, the majority of these coordinates are scattered within the perimeter of the Airport Inn, but with insufficient precision—even if the Airport Inn were only one story tall—to reveal which room, if any, the phone was in at the time of each ping.

. The parties agree that the state court's surveillance order, despite being issued pursuant to federal electronic-surveillance laws, was not a valid search warrant that would on its own justify tracking Riley’s location data,

. Riley also attempts to raise a statutory argument on appeal. As the district court recognized, the statutes that Riley relies upon only provide mechanisms for authorizing access to certain cell-phone data and do not prohibit the government from otherwise tracking an individual’s GPS location data. Thus, the statutes cannot provide Riley with the remedy he seeks—suppression of the evidence against him.

. At oral argument, Riley sought to advance an argument that the government, by initiating a signal to Riley's cell phone rather than merely gathering data that the cell phone emitted on its own, had committed an electronic or digital trespass that was technologically distinguishable from the tracking in Skinner. This argument was not raised in Riley’s brief on appeal, however, and thus it is not properly before us. Moreover, Skinner expressly contemplated tracking "cell site information, GPS real-time location, and 'ping' data,” 690 F.3d at 776, and there is nothing in the record before us to indicate that the *1017 fracking here is technologically distinct from the tracking that occurred in Skinner.