Filed 2/17/22  P. v. Wallravin CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ISODOR WALLRAVIN,<br><br>  Defendant and Appellant. | 2d Crim. No. B309292<br>(Super. Ct. No. 19F-09029)<br>(San Luis Obispo County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 2, 2022, be modified as follows:

1. On page 14, the first paragraph is modified to read:

The prosecutor asked, "Is the court finding there was an emergency under CalECPA?"[1]  The court declined

---

[1] California's Electronic Communications Privacy Act (§§ 1546-1546.4).

to make a finding and responded, "I am not.  So that's part of the unease that I sit with here, but I see them as different standards."  It described Judge Harman's denial of the application as "the final word on that issue, at least until the Appellate Court reviews it."

2.     On page 15, after the first full paragraph, the following paragraph is added:

The trial court here found "some element" of risk of death and great bodily injury, escape, and destruction of evidence.  This satisfied both the Fourth Amendment's "exigent circumstances" standard, and the narrower CalECPA "emergency" standard.

There is no change in judgment.
Appellant's petition for rehearing is denied.

GILBERT, P. J.          YEGAN, J.          TANGEMAN, J.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ISODOR WALLRAVIN,<br><br>    Defendant and Appellant. | 2d Crim. No. B309292<br>(Super. Ct. No. 19F-09029)<br>(San Luis Obispo County) |

        Michael Isodor Wallravin appeals from the judgment after the jury found him guilty of second degree robbery (Pen. Code, § 211)[2] and attempted second degree robbery (§§ 664/211) and found true allegations that he was previously convicted of a serious felony (§ 667, subd. (a)) and two prior strikes (§§ 667, subds. (d) & (e), 1170.12, subds. (b) & (c)).  The trial court sentenced him to 25 years to life in state prison.

---

        [2] Subsequent undesignated statutory references are to the Penal Code.

Wallravin contends the trial court erred when it: (1) failed to appoint two experts to examine his competence, (2) found he was competent without substantial evidence, (3) entered a not guilty plea on his behalf, (4) failed to suppress evidence of the location of his phone, and (5) failed to strike one of the strikes. He further contends that cumulative prejudice requires reversal. We affirm.

## FACTUAL AND PROCEDURAL HISTORY
### *Bank robbery*

One day at about 9:15 a.m., Wallravin and another person went into Pacific Premier Bank in Paso Robles. One wore a Halloween mask, one wore a hockey mask, and both wore gloves and carried guns. They yelled for everyone to get down. One pointed a handgun in the face of an employee, "[s]hoved [the employee's] shoulder with the barrel of the gun," and told him to get on the ground.

One robber pointed a gun at a teller and demanded money from her drawer and from the teller next to her. He said to not give him any "bait money" or "dye packs." She gave him $14,488. He told her he knew her name and where she lived.

One of the robbers cocked his gun, put it in the face of the branch manager, and told her to unlock a teller's drawer. He told her, "I'm not F-ing around." She unlocked the drawer but it was empty. He told her to get money from the vault but the other robber yelled that "they had to go."

They took tellers' business cards, and as they ran out of the bank, they yelled that they knew where the tellers lived. They got into a car and drove away.

As a Paso Robles police officer approached the bank to respond to the robbery, someone jammed the police radio

2

communications. The sheriff's department radio channel was also jammed.

Wallravin purchased the getaway car the day before the robbery. Minutes after the robbery, the car was found in an empty field. Surveillance video showed the car approaching the field, then a pickup truck registered to Mary Wallravin leaving the area. Inside the truck were radio scanners capable of interfering with radio communications of the police and sheriff's departments.

Bank surveillance photographs showed one suspect had a distinctive jaw line, wore a striped gray shirt with unbuttoned cuffs, and held a revolver with a distinctive six-inch barrel. When police located Wallravin, his jawline and shirt matched those in the photographs. After an officer asked Wallravin if he had a black revolver with a six-inch barrel, "his eyes got really big" and he tried to run away. He was carrying keys to the pickup truck and $5,805 in cash, including "bait money" from the bank.

Two bank employees believed that one of the suspects had robbed the same branch two months earlier. They based their belief on his voice, build, walk, demeanor, and similarity of the masks and guns.

### Competency proceedings and plea

Throughout the proceedings, Wallravin said he did not consent to the proceedings and demanded proof of the court's jurisdiction. At arraignment, he said he wanted to represent himself, but he refused to complete a *Faretta*[3] waiver form. He said, "I intend to make a guilty plea." The court stated it was

---

[3] *Faretta v. California* (1975) 422 U.S. 806.

clear he would not participate in the proceedings and could not represent himself. The court appointed counsel over Wallravin's objection.

Appointed counsel, Bradley Cornelius, declared a doubt as to Wallravin's ability to assist in his defense. The court appointed forensic psychologist Kevin Perry, Ph.D., to examine him. Wallravin told the court, "I have no need for a doctor."

Dr. Perry's report, submitted in December 2019, stated that Wallravin refused to participate in an interview. The report stated that Wallravin "asked some relevant questions about [Dr. Perry] and the purpose of the interview. The statements he made were coherent and organized. There were no obvious signs of disorganization . . . . He did not appear to be responding to internal stimuli." Dr. Perry talked to custody staff and reviewed jail records, neither of which showed any psychiatric issues. Dr. Perry concluded he was unable to form an opinion regarding Wallravin's competency in the absence of an interview.

The trial court referred to Dr. Perry's report and stated its "inclination to say he's presumed competent . . . since we have no evidence otherwise." Defense counsel responded, "Submit on that, Your Honor." The court ruled that Wallravin was presumed competent and reinstated criminal proceedings.

Defense counsel said, "I think we need to enter not guilty pleas." Wallravin said he would not continue with the proceedings because his name was listed in all uppercase letters in the complaint. The court entered a not guilty plea on his behalf. Wallravin later told the court on several occasions that he had not entered a plea.

A series of attorneys declared conflicts and the court appointed other attorneys in their place. In response to a question by the court, one of these attorneys, Trace Milan, said he was satisfied that Wallravin was competent.

Another attorney, Harold Mesick, told the court that Wallravin refused to speak with him. Mesick expressed "a serious doubt as to Mr. Wallravin's competency." He based his belief on Wallravin's "conduct in court, his demeanor, his irrational behavior, his refusal to participate in his own defense." Mesick said Wallravin sent him a purported contract and then invoiced him and the deputy district attorney $4.5 million for alleged violations of the contract, and "tries to copyright his name." Mesick said Wallravin "doesn't truly comprehend his status."

Mesick described a motion Wallravin wrote that asserted the court had no jurisdiction based on pleading defects, and claimed the robbery of a federally insured bank must be prosecuted in federal court. Mesick said the motion "makes me question my . . . questioning of his competency because it's rather artfully written." But he nonetheless requested another evaluation.

The court stated that the concepts Wallravin presented were "illogical," "bonkers," and "bizarre." However, the court stated they were presented in "a coherent way," Wallravin was "intelligent and articulate," and the court did not see any "signs of mental illness." The court said that the conduct was "consistent with Mr. Wallravin being an adherent to certain political theories; sovereign citizens, constitutionalists," and did not necessarily "constitute[] mental illness." The court continued, "So, if I had to guess, you are just insisting on holding this world

view, you are being obstinate about it, to this court's view, to your own disinterest."

The court asked if Wallravin wanted doctors appointed. He responded, "No, I don't need that. I need to be shown the jurisdiction." Nevertheless, the court again suspended criminal proceedings and appointed a second clinical psychologist, Carolyn Murphy, Ph.D., to "rule out the possibility that mental illness is here."

Dr. Murphy's report stated that Wallravin declined to participate in the evaluation. However, he was "fluent," "alert and fully oriented," and his writings were "advanced." He had "no known mental health history" and showed no signs of mood disturbance, thought disorganization, delusional ideation, mania, intellectual limitations, autism, or "any sort of mental health condition that would give rise to a finding of incompetence." The report concluded, "Without more information about his history and a full medical workup to rule out any underlying condition or conditions that could be affecting his functioning, this examiner simply cannot reach a conclusion as to his competence at this time." The report "suggested that counsel look into his background to see if there is any history of mental health difficulty . . . . If not, it is then suggested that the court to order [sic] a full medical evaluation to ensure that there is no underlying medical reason for his conduct."

At a hearing in July 2020, the court stated it read Dr. Murphy's report and the previous report. Defense counsel and the prosecution submitted on Dr. Murphy's report. Wallravin objected. There was no request for a medical workup or further psychological examination. The court found that Wallravin was

able to cooperate with counsel but chose not to do so based on his beliefs. The court reinstated criminal proceedings.

The court denied the "Motion to Withdraw Plea in Order to Demurrer" that Wallravin prepared and stated that "to the extent that that's a barrier to you making a demurrer," it would address the demurrer on the merits. The court then overruled the demurrer.

After the court scheduled a trial readiness date, the prosecutor made a plea offer. The court asked Wallravin if he wanted time to negotiate with the People. He responded, "I don't consent to none of this process." The trial proceeded and Wallravin was convicted by the jury.

### Sentencing

After Wallravin was convicted, the trial court struck the five-year enhancement for the prior serious felony conviction. (§§ 667, subd. (a), 1385.) The court denied the *Romero*[4] motion to strike the prior strikes. The court imposed third-strike sentences of 25 years to life for each count, to be served concurrently.

## DISCUSSION

### Competency examinations

Wallravin contends the trial court erred when it failed to appoint two experts to examine his competence to stand trial on each occasion that his counsel declared a doubt. He is wrong.

"A person shall not be tried . . . while that person is mentally incompetent. A defendant is mentally incompetent . . . if, as a result of a mental health disorder or developmental

---

[4] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

7

disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

If counsel informs the court that the defendant may be mentally incompetent, criminal proceedings are suspended until the mental competence of the defendant is determined. (§ 1368.) "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. If the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof." (§ 1369, subd. (a)(1).)

Here, the trial court was not required to appoint a second expert on each occasion that a doubt was declared "because neither defendant nor counsel *expressly informed* the court during the competency hearing that defendant was not seeking a finding of incompetence." (*People v. D'Arcy* (2010) 48 Cal.4th 257, 281, italics added.) Wallravin's statements that he did not "need" a doctor were made in the context of his objection to virtually every aspect of the proceedings, based on his theory that the court lacked jurisdiction over him.

Even if Wallravin or his counsel had said he did not seek a finding of incompetence, the court's failure to appoint two experts for each of the two competency examinations was harmless. When the second competency finding was made, the trial court considered the reports of both experts. Moreover, "[t]he appointment of two experts . . . provides a minimum protection for the defendant against being incorrectly found *incompetent* to stand trial." (*People v. Harris* (1993) 14

8

Cal.App.4th 984, 996, italics added.)  Because the trial court found him competent, he was not prejudiced by the failure to appoint additional experts.  He has not shown "'a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.'" (*People v. Leelu* (2019) 42 Cal.App.5th 1023, 1031-1032; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

*People v. Wycoff* (2021) 12 Cal.5th 58, relied upon by Wallravin, does not preclude a finding of harmless error.  In *Wycoff*, a psychologist appointed to assess the defendant's competence to represent himself volunteered the additional opinion that he was not competent to stand trial.  (*Id*. at pp. 77-78.)  Our Supreme Court concluded that the trial court's "failing to initiate the formal competency procedures set forth in sections 1368 and 1369" was not harmless under those circumstances.  (*Id*. at p. 91.)  In contrast here, the trial court suspended criminal proceedings and appointed psychologists to evaluate Wallravin's competency to stand trial.  The parties submitted the issue of competency on the doctors' reports and did not offer additional evidence or argument.  The trial court did not err, and even if it did, the error was harmless.

### *Competency finding*

Wallravin contends the trial court erred when it found him competent without substantial evidence to support that conclusion.  We disagree.

We review a finding of competency "'in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 797.)  "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence

9

that the defendant is mentally incompetent." (§ 1369, subd. (f); *Blacksher*, at p. 797.)  There is no evidence here to rebut the presumption of competency because there is no evidence that Wallravin had a mental health disorder or developmental disability.

Wallravin contends the trial court should have ordered a medical evaluation, as Dr. Murphy suggested.  This issue is forfeited because Wallravin submitted the competency determinations on the reports and did not request additional evaluations.  (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 797.)

As noted by the trial court, Wallravin made statements throughout the proceedings consistent with "sovereign citizen" political beliefs.  For example, he claimed that the court had no jurisdiction over him because he had not entered into a contract with the court, and because the complaint listed his name in uppercase letters.  (See *United States v. Mitchell* (D.Md. 2005) 405 F.Supp.2d 602; Kalinowski, *A Legal Response to the Sovereign Citizen Movement* (2019) 80 Mont. L.Rev. 153.) While these views are inconsistent with basic principles of our judicial system, they do not establish "a mental health disorder or developmental disability."  (§ 1367, subd. (a).)  On the contrary, Wallravin demonstrated that he was literate and intelligent.  He understood the nature of the criminal proceedings but disagreed with the court's authority to conduct them.  He was not *unable* to assist counsel, but chose not to do so.

Wallravin relies upon *People v. Wycoff*, *supra*, 12 Cal.5th at p. 84, which states that our Supreme Court "ha[s] repeatedly reaffirmed that a finding of incompetence to stand trial can be based solely on a defendant's 'incapab[ility] of . . . cooperating with counsel.'"  But neither *Wycoff*, nor the cases

on which it relies, allow a finding of incompetence based on inability to cooperate with counsel unless it is caused by a mental health disorder. In *Wycoff*, the psychologist diagnosed the defendant as suffering from "'Paranoid Schizophrenia,'" including "'paranoid and grandiose delusions,'" and "directly linked defendant's tumultuous relationships with counsel to his 'paranoid mental disorder.'"" (*Id.* at pp. 76-77.) The cases cited by *Wycoff* either involve mental health disorders (*People v. Pennington* (1967) 66 Cal.2d 508, 512 [schizophrenia or paranoia, hallucinations, "psychotic furor"]) or found an insufficient basis to require competency hearings (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465-466; *People v. Lewis* (2008) 43 Cal.4th 415, 525-526). Here, there is no evidence that Wallravin's failure to cooperate with counsel was based on a mental health disorder.

### *Entry of not guilty plea*

Wallravin contends the trial court improperly entered a not guilty plea on his behalf. The issue is forfeited, and any error is harmless.

"Unless otherwise provided by law, every plea shall be entered or withdrawn by the defendant himself or herself in open court." (§ 1018; *People v. Reza* (1984) 152 Cal.App.3d 647, 651.) "If the defendant refuses to answer the accusatory pleading, by demurrer or plea, a plea of not guilty must be entered." (§ 1024.)

On the suggestion of his counsel, the court entered a not guilty plea on Wallravin's behalf. Wallravin later moved to withdraw the plea for the specific purpose of eliminating a procedural barrier to his demurrer. (See §§ 1003, 1007; *Hudson v. Superior Court* (2017) 7 Cal.App.5th 999, 1017.) By failing to move to withdraw the plea to enter a different plea, he forfeited

11

the issue.  (See *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413 [failure to move to withdraw guilty plea forfeited claim it was not entered knowingly or intelligently].)

Despite Wallravin's consistent objections to the court's jurisdiction, the court should have asked him how he pled. (§§ 1018, 1024.)  But Wallravin was not denied the opportunity for a more favorable outcome.  When the prosecution made a plea offer, Wallravin responded only that he did not consent to the proceedings, and never sought to accept the offer.  Any irregularity in the entry of the plea was harmless because "we cannot see that any of the substantial rights of the defendant were in any way prejudiced."  (*People v. McCoy* (1886) 71 Cal. 395, 396 [not guilty plea by counsel after defendant stood mute].)

### *Motion to suppress*

Wallravin contends the trial court erred when it failed to suppress evidence derived from the location of his phone after the robbery.  There was no error.

### *1. Facts*

Shortly after the robbery, police asked AT&T to "ping" Wallravin's cell phone to obtain its GPS coordinates.[5]  An officer went to the location and saw Wallravin "in the open" in a commercial area near a car wash.  The officer contacted Wallravin, who had the phone and was wearing a shirt similar to that shown in the bank surveillance photographs.  He carried keys to the truck and $5,805 in cash, including "bait money" from the bank.  Police searched the phone and found a text message

---

[5] A "ping" refers to a service provider sending a signal to a cell phone to identify its real-time GPS location.  (*United States v. Riley* (6th Cir. 2017) 858 F.3d 1012, 1014, fn. 1.)

12

from the night before the robbery that stated, "Tomorrow it's on and cracking after nine."

Ten days later, Detective Bryce Lickness submitted an affidavit requesting approval of the "ping" based on an emergency. Judge Dodie Harman denied the request because exigent circumstances had not been shown.

### 2. Hearing

Prior to trial, Wallravin moved to suppress all evidence derived from AT&T obtaining his cell phone location. (§§ 1538.5, 1546.4, subd. (a).)

Lickness testified that he believed there were exigent circumstances because a bank robbery had just occurred and the suspects pointed firearms at the tellers, told them to get on the ground, took the tellers' business cards, and threatened them. Jamming law enforcement's radio frequencies "introduced another high level of danger for the public and law enforcement." He knew that one of the suspects may have committed an earlier armed robbery of the same bank. He submitted the application 10 days after the ping because he was working on other aspects of the case and was not aware of the three-day deadline until he began working on the application. (§ 1546.1, subd. (h).)

The court found probable cause that Wallravin committed the crimes, that police acted in good faith, and there was a "well-founded belief" that the suspect "presented a danger." The court found exigent circumstances pursuant to the Fourth Amendment based on the risk of death and great bodily injury, escape, and destruction of evidence. The court stated, "There was some element of all those things present." The court suppressed the "electronic information" obtained from the ping but not evidence obtained when Wallravin was located.

The prosecutor asked, "Is the court finding there was an emergency under CalECPA?"[6] The court responded, "I am not. So that's part of the unease that I sit with here, but I see them as different standards." It described Judge Harman's denial of the application as "the final word on that issue, at least until the Appellate Court reviews it."

### 3. *Discussion*

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

CalECPA restricts government access to "electronic communication information," which includes the "location of the sender or recipients at any point during the communication." (§ 1546, subd. (d).) Except as provided, a government entity may not "[c]ompel the production of or access to electronic communication information from a service provider." (§ 1546.1, subd. (a)(1).) Nor may a government entity "[a]ccess electronic device information by means of physical interaction or electronic communication with the electronic device." (§ 1546.1, subd. (a)(3).) But CalECPA does allow a government entity to access electronic device information if it, "in good faith, believes that an emergency involving danger of death or serious physical injury to

---

[6] California's Electronic Communications Privacy Act (§§ 1546-1546.4).

14

any person requires access to the electronic device information." (§ 1546.1, subd. (c)(6).)

In *People v. Bowen* (2020) 52 Cal.App.5th 130, 137, the court held that an emergency justified pinging a cell phone, without prior judicial authorization, of a suspect who had "'brutally stabbed'" the victim near a preschool and a shopping center, and who was "'still possibly armed.'" The court stated, "'"A long-recognized exception to the warrant requirement exists when 'exigent circumstances' make necessary the conduct of a warrantless search. . . . '"[Ex]igent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall imminent escape of a suspect or destruction of evidence.'"'" (*Id.* at p. 138, citing *People v. Panah* (2005) 35 Cal.4th 395, 465.)

Wallravin contends that his release from custody after his arrest shows that officers were not concerned about the safety of witnesses or others. This contention fails because the record does not establish what official or agency released him from custody, or their reason for doing so.

Nor was suppression of evidence warranted based on delay in seeking judicial approval 10 days after the ping rather than the three court days provided by statute. (§ 1546.1, subd. (h).) CalECPA provides that a party "may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter." (§ 1546.4, subd. (a).) But the exclusionary remedy is not required for every technical violation of CalECPA, and is not warranted here. (See *United States v. Chavez* (1974) 416 U.S. 562, 575 ["suppression is not mandated for every violation" of

15

analogous federal statute]; *People v. Head* (1994) 30 Cal.App.4th 954 [no suppression for late filing of search warrant return].)[7]

### *Cumulative error*

Wallravin contends the combination of the asserted errors rendered the resulting trial unfair. We disagree.

"'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) Any irregularities here in the competency proceedings, entry of the not guilty plea, and late filing of the cell phone affidavit did not deny Wallravin a fair trial.

### Romero *motion*

Wallravin contends the trial court abused its discretion when it failed to strike one of the strikes. There was no abuse of discretion.

A trial court has the discretion to dismiss a prior violent or serious felony conviction pursuant to the Three Strikes law. (*Romero*, 13 Cal.4th at p. 504.) We review the trial court's decision to not dismiss a strike for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

In reviewing a ruling whether to strike a strike, we "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's

---

[7] Based on our conclusion that the ping was justified by a good-faith belief of exigent circumstances, we do not consider the Attorney General's alternate theories.

spirit." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) Those factors support denial of the *Romero* motion here.

The current crimes were serious—bank robbery and attempted robbery in which bank employees were ordered to the ground and guns pointed in their faces. The crimes were sophisticated, with the robbers wearing masks and gloves, switching vehicles, and jamming police radios. Although perhaps not the "mastermind," Wallravin's role was neither "passive" nor "minor."

The trial court imposed a three-strikes sentence of 25 years to life based on two prior robbery convictions from 1991. (§§ 211, 667, subd. (e)(2)(A)(ii), 1170.12, subd. (c)(2)(A)(ii).) In a *Romero* motion, the court may consider the age of the prior offenses. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1141.) But the court may not strike a prior solely because it is remote in time. (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 812-813 [error to strike 20-year-old strike]; *People v. Pearson* (2008) 165 Cal.App.4th 740, 749-750 [strikes 24, 15, and 10 years old properly imposed].)

Wallravin had been crime free between his release from prison in 2009 and the current offense in 2019. But his background included other criminal convictions, including a 2004 grand theft in which he pushed a woman down and took her purse. (§ 487, subd. (c).) His record reflected a large number of theft convictions.

The trial court found no "reason to believe that . . . a mental health condition played any part in this incident." And although Wallravin was 62 years old and a sentence of 25 years to life might result in him spending the rest of his life in prison, "middle age, considered alone, cannot take a defendant outside

17

the spirit of the [Three Strikes] law." (*People v. Strong* (2001) 87 Cal.App.4th 328, 332.)

In denying a *Romero* motion, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th 367, 377.)  The trial court here did not abuse its discretion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

18

Jesse J. Marino and Dodie A. Harman, Judges

Superior Court County of San Luis Obispo

_____

       The Law Office of John Derrick and John Derrick for Defendant and Appellant.

       Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.